ORAL ARGUMENT NOT YET SCHEDULED

No. 26-1036

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

SIERRA CLUB and
NATURAL RESOURCES DEFENSE COUNCIL, INC.,
*Petitioners*,

v.

CHRIS WRIGHT, in his official capacity
as Secretary of Energy, and U.S. DEPARTMENT OF ENERGY,
*Respondents*.

---

On Petition for Review of Orders of the Department of Energy

---

# FEDERAL RESPONDENTS' PROOF ANSWERING BRIEF

---

Of counsel:

BETTINA MUMME
*Attorney*
Office of General Counsel
U.S. Department of Energy

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT J. LUNDMAN
CHRISTOPHER ANDERSON
*Attorneys*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-1971
christopher.anderson3@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici

All parties, intervenors, and amici appearing before this court are listed in the Brief for Petitioners.

## B. Rulings Under Review

References to the orders at issue appear in the Brief for Petitioners.

## C. Related Cases

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

s/ *Christopher Anderson*
Christopher Anderson
Counsel for the Federal Respondents

## TABLE OF CONTENTS


Certificate as to Parties, Rulings, and Related Cases .... i

Table of Authorities .... iv

Glossary .... viii

Introduction .... 1

Statement of Jurisdiction .... 4

Issues Presented .... 5

Pertinent Statutes and Regulations .... 6

Statement of the Case .... 6

- A. Statutory and regulatory background .... 6
  - 1. Natural Gas Act .... 6
  - 2. National Environmental Policy Act .... 9
- B. Energy's categorical exclusion for orders to authorize export of LNG by marine vessel to non-FTA countries .... 10
- C. The orders under review .... 13

Summary of Argument .... 16

Standard of Review .... 21

Argument .... 22

- I. The NGA does not require Energy to consider upstream or downstream environmental effects when authorizing exports of LNG. .... 22
- II. Energy reasonably adopted the Exclusion Rule. .... 29
  - A. NEPA does not require consideration of upstream or downstream environmental effects. .... 30
  - B. Energy's ship traffic analysis was sound. .... 36
  - C. Energy properly adopted the Exclusion Rule. .... 40

D. Energy reasonably determined that upstream and downstream effects are not foreseeable. ....41

1. Upstream effects ....41

2. Downstream effects .... 43

III. Energy properly excluded terminal effects because it lacks authority over the construction and operation of LNG Terminals. .... 45

A. Energy lacks statutory authority to regulate the construction or operation of LNG Terminals. .... 45

B. Even if Energy had authority over the construction of LNG Terminals, those effects would be properly excluded. .... 50

C. Neither the NGA nor NEPA requires that a single agency examine "the big picture" on exports. .... 53

IV. If Energy erred in its environmental analysis, vacatur would not be appropriate. .... 56

A. There is no reason to believe Energy would deny CP2 LNG's application if it undertook additional environmental analysis. .... 56

B. Vacatur of the Authorization Order would not be appropriate because it would be highly disruptive. .... 58

C. If the Court finds errors in the Exclusion Rule, vacatur would be unnecessary. .... 59

Conclusion ....60

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993) .......... 58

*Appalachian Voices v. FERC*,
139 F.4th 903 (D.C. Cir. 2025) .......... 39

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council*,
462 U.S. 87 (1983) .......... 21, 39

*Beyond Nuclear, Inc. v. Nuclear Regulatory Commission*,
___ F.4th ___, 2026 WL 2093882 (D.C. Cir. 2026) .......... 37

*Bohon v. FERC*,
37 F.4th 663 (D.C. Cir. 2022) .......... 5

*Bostock v. Clayton County*,
590 U.S. 644 (2020) .......... 45

*Central Hudson Gas & Electric Corp. v. FERC*,
138 F.4th 531 (D.C. Cir. 2025) .......... 4

*City of Oberlin v. FERC*,
937 F.3d 599 (D.C. Cir. 2019) .......... 27, 58

*Ctenter for Biological Diversity v. FERC*,
67 F.4th 1176 (D.C. Cir. 2023) .......... 24

*CTS Corp. v. EPA*,
759 F.3d 52 (D.C. Cir. 2014) .......... 52

*Department of Transportation v. Public Citizen*,
541 U.S. 752 (2004) .......... 10, 31, 34, 51, 56

*El Puente v. U.S. Army Corps of Engineers*,
100 F.4th 236 (D.C. Cir. 2024) .......... 22, 38, 39, 41, 57

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .......... 28

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......................................................................... 27

*Federal Power Commission v. Hope Natural Gas Co.*,
320 U.S. 591 (1944)............................................................................ 8

*Legal Services Corp. v. Velazquez*,
531 U.S. 533 (2001)........................................................................... 47

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......................................................................... 49

*BP p.l.c. v. Mayor & City Council of Baltimore*,
593 U.S. 230 (2021) .......................................................................... 46

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
460 U.S. 766 (1983) ...........................................................................31

*N.J. Conservation Foundation v. FERC*,
111 F.4th 42 (D.C. Cir. 2024) ................................................... 27, 43

*National Association for the Advancement of Colored People v. Federal Power Commission* (*NAACP*),
425 U.S. 662 (1976) ................................................... 8, 22, 24-26

*Save the Sound, Inc. v. FAA*,
____ F.4th ____, 2026 WL 2093931 (D.C. Cir. 2026)................................ 3

*Seven County Infrastructure Coalition v. Eagle County*,
605 U.S. 168 (2025)...... 3, 9, 10, 21,23, 31, 32, 35, 37, 39-41, 50-53, 56, 57

*Sierra Club v. Department of Energy* (*Alaska LNG*),
134 F.4th 568 (D.C. Cir. 2025) ................................... 7, 21, 24, 41, 44, 47

*Sierra Club v. Department of Energy* (*Freeport II*),
867 F.3d 189 (D.C. Cir. 2017) ......................................... 21, 27, 42, 44, 57

*Sierra Club v. FERC* (*Cumberland*),,
153 F.4th 1295 (D.C. Cir. 2025) ............................. 4, 21, 27, 32, 33, 52, 53

*Sierra Club v. FERC (Freeport I)*,
827 F.3d 36 (D.C. Cir. 2016)................................................................ 47

*Sierra Club v. FERC* (*Sabal Trail*),
867 F.3d 1357 (D.C. Cir. 2017)............................................... 27, 32, 33

*Syracuse Peace Council v. FCC*,
867 F.2d 654 (D.C. Cir. 1989) ........ 29

*U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*,
513 U.S. 18 (1994) ........ 59

*West Virginia Public Services Commission v. Department of Energy*,
681 F.2d 847 (D.C. Cir. 1982) ........ 27

**Statutes**

15 U.S.C. § 717(a)(11) ........ 7

15 U.S.C. § 717a ........ 47

15 U.S.C. § 717a(9) ........ 46

15 U.S.C. § 717b(a) ........ 7, 23

15 U.S.C. § 717b(c) ........ 1

15 U.S.C. § 717r ........ 5

15 U.S.C. § 717r(a) ........ 16

15 U.S.C. § 717r(b) ........ 4, 21

42 U.S.C. § 4332(C) ........ 9

42 U.S.C. § 4336e(1) ........ 10

42 U.S.C. § 7151(b) ........ 46

Natural Gas Act, 52 Stat. 821 (1938) ........ 6

Energy Policy Act of 2005, Pub. L. 109-58 ........ 45

Department of Energy Organization Act, Pub. L. No. 95-91 ........ 6

**Regulations**

43 Fed. Reg. 56003 (Nov. 29, 1978) ........ 10

49 Fed. Reg. 6672 (Feb. 22, 1984) ........ 49

85 Fed. Reg. 25340 (May 1, 2020) ........ 11

85 Fed. Reg. 78197 (Dec. 4, 2020) ........ 12

90 Fed. Reg. (Feb. 25, 2025) ........................................................ 10, 53

**Other Authorities**

H.R. Rep. 109-49 (Apr. 19, 2005) ........................................................ 47

S. Rep. 109-78 (June 9, 2005)........................................................ 48

151 Cong. Rec. 13607 (2005 ........................................................ 48

Executive Order 14154 (Jan 20, 2025)........................................................ 14, 15

*Webster's Third New International Dictionar*y (1976) ........................................................ 26

## GLOSSARY

| | |
|---|---|
| 2024 LNG Export Study | *2024 LNG Export Study: Energy, Economic, and Environmental Assessment of U.S. LNG Exports* |
| CP2 LNG | Venture Global CP2 LNG, LLC |
| FERC | Federal Energy Regulatory Commission |
| FTA countries | Nations with which there is in effect a free trade agreement requiring national treatment for trade in natural gas |
| LNG | Liquefied Natural Gas |
| LNG Terminals | Facilities for the liquefaction and export of natural gas as defined at 15 U.S.C. § 717(a)(11) |
| NEPA | National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4347 |
| NGA | Natural Gas Act, 15 U.S.C. §§ 717-717z |
| Non-FTA countries | Nations with which there is not in effect a free trade agreement requiring national treatment for trade in natural gas |

## INTRODUCTION

In the Natural Gas Act (NGA), Congress established a policy in favor of permitting the export of natural gas and tasked the Department of Energy (Energy) with authorizing such exports. Energy must authorize exports to nations with which the United States has a free trade agreement requiring national treatment for trade in natural gas (FTA countries). 15 U.S.C. § 717b(c). Energy must also authorize exports to nations without such free trade agreements and with which trade is not prohibited by U.S. law or policy (non-FTA countries), unless Energy determines that such exports "will not be consistent with the public interest." *Id.* § 717b(a).

Though important, Energy's role in authorizing exports is narrow. Its primary concern is to ensure that the requested exports will not threaten domestic supplies of natural gas. The NGA does not give Energy authority to control the volume of natural gas produced, where that gas is produced, or how it is transported within the United States. While most facilities for the liquefaction and export of natural gas (LNG Terminals) are regulated under the NGA, regulatory authority for those facilities is assigned to the Federal Energy Regulatory Commission (FERC), not Energy. And Energy has no authority over how exported natural gas is used in a destination country or the effects of that use.

Because Energy's role is statutorily limited, the required scope of its analysis under the National Environmental Policy Act (NEPA) is similarly constrained. The only environmental effects that Energy must consider are the direct effects of exporting activities. Those activities start at the point of delivery of the liquefied natural gas (LNG) onto export vessels and extend through transportation of the LNG to the territorial waters of the receiving nation. Energy assessed the environmental effects of those activities and determined that they are likely to be insignificant. Accordingly, Energy promulgated a rule categorically excluding export of LNG by marine vessel from NEPA's requirement to prepare an environmental impact statement (Exclusion Rule). Energy applied the Exclusion Rule when it authorized Venture Global CP2 LNG, LLC (CP2 LNG) to export natural gas to non-FTA nations (Authorization Order).

Sierra Club and Natural Resources Defense Council, Inc. (Sierra Club) argue that NEPA required Energy to consider a much larger range of upstream and downstream environmental effects, but Sierra Club misunderstands Energy's role under the NGA and NEPA. At the heart of its arguments is Sierra Club's assertion that Energy should engage in an open-ended balancing of the costs and benefits of exporting natural gas—including whether and how the natural gas will be used—when evaluating whether particular

exports would not be consistent with the public interest. But Congress determined that exports of natural gas are presumptively in the public interest, and Congress knows that natural gas is exported *for use* by foreign nations—use that logically results in emissions. The primary purpose of Energy's public interest analysis is instead to ensure that exports would not cause domestic supply disruptions. Analysis of the broad range of environmental effects demanded by Sierra Club is thus not useful to Energy's delegated decisionmaking process and therefore lies outside the scope of the analysis NEPA requires.

The Supreme Court recently admonished that "a course correction" is needed to bring "NEPA back in line with the statutory text and common sense." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty*, 605 U.S. 168, 184 (2025). Throughout its brief, Sierra Club nevertheless urges the Court to impose expansive requirements on Energy to evaluate indirect upstream and downstream effects of LNG export activities outside the scope of Energy's regulatory authority. And Sierra Club fails to acknowledge the substantial discretion agencies exercise in determining the appropriate breadth and depth of their NEPA analyses. Sierra Club's position thus reflects an approach to NEPA that is no longer tenable. As this Court has repeatedly said, "the era of searching NEPA review is over." *Save the Sound, Inc. v. FAA*, ____

F.4th ___, 2026 WL 2093931, at *8 (D.C. Cir. 2026) (quoting *Sierra Club v. FERC* (*Cumberland*), 153 F.4th 1295, 1311 (D.C. Cir. 2025)).

## STATEMENT OF JURISDICTION

The NGA confers original jurisdiction on the courts of appeals to review final orders issued under the Act within sixty days following agency action on a timely petition for rehearing of the order. 15 U.S.C. § 717r(b). Energy issued the Authorization Order on October 21, 2025, and Sierra Club timely sought rehearing before Energy on November 20, 2025. *See id.* § 717r(a). On December 21, 2025, Sierra Club could consider its application for rehearing denied by operation of law, *id.* § 717r(a), and Sierra Club subsequently filed a timely petition for review of the Authorization Order and the denial of rehearing on February 17, 2026. *See id.* The petition for review further asked the Court to set aside the Exclusion Rule. Pet. 2. As permitted by the NGA, Energy issued an order denying Sierra Club's application for rehearing on March 26, 2026 (Rehearing Order), before the administrative record was filed in this Court. *See id.* § 717r(b). This Court therefore has jurisdiction to review the Authorization Order as amended by the Rehearing Order. *See Cent. Hudson Gas & Elec. Corp. v. FERC*, 138 F.4th 531, 534 (D.C. Cir. 2025).

This Court also has jurisdiction over Sierra Club's facial challenge to the Exclusion Rule. As Sierra Club observes, Br. 6, the Exclusion Rule can be applied only in proceedings for authorizations to export LNG by marine vessel, and such orders are reviewable only in the courts of appeals under 15 U.S.C. § 717r. Sierra Club's facial challenge is therefore "anchored in [export authorization] proceedings," and this Court has jurisdiction to consider that challenge. *Bohon v. FERC*, 37 F.4th 663, 666 (D.C. Cir. 2022), *vacated*, 143 S. Ct. 1779 (2023), *judgment reinstated*, 92 F.4th 1121 (D.C. Cir. 2024).

## ISSUES PRESENTED

1. Whether Energy properly excluded upstream and downstream environmental effects from its consideration of CP2 LNG's application to export natural gas under section 3 of the NGA.

2. Whether Energy properly adopted a categorical exclusion for authorizations to export LNG by marine vessel when Energy determined that the scope of analysis required by NEPA is limited to the effects of LNG export activities and reasonably concluded that those activities normally do not have a significant effect on the human environment.

3. Whether Energy properly excluded consideration of environmental effects related to the construction and operation of LNG Terminals because Energy does not exercise jurisdiction over LNG Terminals.

4. If the Court determines that Energy erred in its environmental analysis, (a) whether vacatur of the Authorization Order would be inappropriate because there is no reason to believe that Energy would reach a different conclusion if it conducted a more extensive analysis and vacatur would be highly disruptive and (b) whether vacatur of the Exclusion Rule is unnecessary because Energy could correct any errors through additional explanation.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### A. Statutory and regulatory background

#### 1. Natural Gas Act

Congress enacted the NGA in 1938. 52 Stat. 821 (June 21, 1938). The Act authorized the then-existing Federal Power Commission to regulate the interstate sale and transportation of natural gas, as well as natural gas imports and exports. In 1977, Congress enacted the Department of Energy Organization Act, Pub. L. No. 95-91, 91 Stat. 565 (Aug. 4, 1977), creating the Department of Energy and FERC and transferring the Federal Power Commission's authorities to those agencies. As pertains to natural gas exports, Energy now administers section 3(a) of the NGA, which governs import and

export authorizations, while FERC administers section 3(e), which governs siting and construction of onshore and near-shore LNG Terminals.[1] *See id.* As a result, approvals for LNG export projects must be sought in separate proceedings before Energy and FERC.

Section 3(a) of the Act requires Energy's authorization for the import or export of natural gas but provides that Energy "shall" grant such authorization, "unless, after opportunity for hearing, [Energy] finds that the proposed exportation or importation will not be consistent with the public interest." 15 U.S.C. § 717b(a). This Court has interpreted that language to create a rebuttable presumption that exports are in the public interest. *Sierra Club v. Dep't of Energy* (*Alaska LNG*), 134 F.4th 568, 572-73 (D.C. Cir. 2025). Section 3(c) further provides that the exportation of natural gas to nations "with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay." *Id.* § 717b(c). Thus, as to FTA countries, export authorization is mandated.

---

[1] The NGA defines LNG Terminal to include "all natural gas facilities located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is … exported to a foreign country from the United States." 15 U.S.C. § 717a(11).

The NGA does not identify the factors Energy must weigh when considering whether particular exports would not be consistent with the public interest. The Supreme Court has held, however, that the term "public interest" "take[s] meaning from the purposes of the regulatory legislation," and that Energy's "charge" is "to promote the orderly production of plentiful supplies of … natural gas at just and reasonable rates." *Nat'l Ass'n for the Advancement of Colored People v. Fed. Power Comm'n* (*NAACP*), 425 U.S. 662, 670 (1976); *see also Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 610 (1944) ("The primary aim of this legislation was to protect consumers against exploitation at the hands of natural gas companies.").

In evaluating an export application under the public interest standard, Energy applies its 1984 Policy Guidelines, which establish a policy of minimizing federal control and involvement in energy markets and promoting a balanced and mixed energy resource system.[2] CP20052 at 6687-88. Energy's review of non-FTA export applications focuses on: (i) the domestic need for the natural gas proposed to be exported, (ii) whether the proposed exports pose a threat to the security of domestic natural gas supplies, (iii) whether the arrangement is consistent with Energy's policy of promoting market

[2] While the 1984 Policy Guidelines discuss only natural gas imports, Energy determined in 1999 that the same Policy Guidelines should be applied to natural gas export applications. CP20055 at 14.

competition, and (iv) any other factors bearing on the public interest as determined by Energy in the circumstances of the particular case, including economic and energy security considerations. CP20048 at 26.

To conduct its public interest review, Energy looks to record evidence developed in the application proceeding. Before reaching a final decision, Energy must also comply with NEPA. Since 2010, Energy has granted 57 applications for long-term authorization of large-scale exports of domestically produced natural gas as LNG to non-FTA countries.[3] To date, Energy has not denied a non-FTA application.

### 2. National Environmental Policy Act

"NEPA is a purely procedural statute"; it "imposes no substantive environmental obligations or restrictions." *Seven Cnty.*, 605 U.S. at 173. As relevant, it requires only that agencies prepare an environmental impact statement for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Agencies have the power, by rule, to "categorically exclude" from the environmental impact statement requirement those major actions that the agency has determined, based on analysis and experience, normally do not have a significant effect on the human

---

[3] Several of these authorizations have expired or were administratively vacated, but none over the objection of the authorization holder. CP20048 at 59 n.320.

environment. *See* 43 Fed. Reg. 56003 (Nov. 29, 1978), *rescinded*, 90 Fed. Reg. 10616 (Feb. 25, 2025). Congress affirmed that authority in amendments to NEPA in 2023. *See* 42 U.S.C. § 4336e(1).

NEPA requires an agency to analyze environmental effects only of the "project at hand." *Seven Cnty.*, 605 U.S. at 182. That means NEPA never requires an agency to consider the cumulative effects of "upstream" or "downstream" projects "that are separate in time or place" from the project at hand. *Id.* at 179.

Because the "goal" of NEPA "is to inform agency decisionmaking," *id.* at 173, the extent of the analysis required depends on "the usefulness of any new potential information to the decisionmaking process." *Id.* at 181. (quoting *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004)). For that reason, an agency need not analyze effects if it lacks "statutory authority over the relevant actions." *Pub. Citizen*, 541 U.S. at 771; *accord Seven Cnty.*, 605 U.S. at 191 n.6; *id.* at 198-99 (Sotomayor, J., concurring).

### B. Energy's categorical exclusion for orders to authorize export of LNG by marine vessel to non-FTA countries

In 2020, Energy proposed categorically excluding from the requirement to prepare an environmental impact statement "[a]pprovals or disapprovals of new authorizations or amendments of existing authorizations to export natural gas under section 3 of the NGA and any associated

transportation of natural gas by marine vessel." 85 Fed. Reg. 25340, 25344 (May 1, 2020) [JA___]. Energy observed that its authority under the NGA is limited to authorizing the export of natural gas and that NEPA does not require Energy to analyze "effects that the agency has no authority to prevent." CP20002 at 25341. Energy therefore concluded that its NEPA analysis should "focus exclusively on … potential environmental impacts resulting from actions occurring at or after the point of export." *Id*. Those actions begin "when the LNG is delivered to the flange of the LNG export vessel" and conclude when the LNG reaches "the territorial waters of the receiving country." DOE0001 at 78199. Energy then evaluated the environmental effects of those activities in a Technical Support Document and determined, "[b]ased on prior NEPA reviews and technical reports," that "transport of natural gas by marine vessel normally does not pose the potential for significant environmental impacts." DOE0002 at 25342.

Consistent with the new proposed categorical exclusion, Energy proposed rescinding two existing categorical exclusions for approvals to import or export natural gas in certain circumstances. Energy also proposed rescinding regulations normally requiring preparation of an environmental assessment for "approvals or disapprovals to import or export natural gas involving minor new construction" or preparation of an environment impact

statement for "approvals or disapprovals to import or export natural gas involving major new facilities or major operational changes." *Id.* at 25341-42.

After a public comment period, Energy adopted the proposed categorical exclusion and the proposed rescissions in a final rule. 85 Fed. Reg. 78197, 78197 (Dec. 4, 2020) [JA____]. Energy reaffirmed that its NEPA review "is properly focused on potential environmental impacts" that "would occur at or after the point of export to non-FTA countries," *id.* at 78198, and that those impacts "are limited to the marine transport effects," *id.* at 78197. In response to comments arguing that Energy needed to consider upstream and downstream environmental impacts beyond the export itself, Energy concluded that both upstream and downstream environmental effects lack a "sufficiently close causal connection to the granting of the export authorization" to be included within the NEPA analysis. *Id.* Energy further found that such effects are not "reasonably foreseeable for NEPA purposes and are therefore not 'effects' subject to analysis." *Id.* at 78200 Energy also reiterated that it is not required to assess "potential environmental impacts associated with the construction or operation of natural gas export facilities because Energy lacks authority to approve the construction or operation of those facilities." *Id.* at 78198.

### C. The orders under review

In December 2021, CP2 LNG applied to FERC for authorization under section 3 of the NGA to build a new LNG Terminal and related facilities on the east side of the Calcasieu Ship Channel in Cameron Parish, Louisiana. CP2 LNG's affiliate, Venture Global CP Express, LLC, also applied to FERC for authorization under NGA section 7 to construct and operate a new interstate natural gas pipeline to connect the terminal to the U.S. natural gas pipeline grid. CP20189 at 1-2.

At the same time, CP2 LNG applied to Energy for authorization to export LNG equivalent to 1,446 billion cubic feet per year of natural gas from the proposed new terminal to FTA or non-FTA countries. CP20001 at 2. As required by the NGA, Energy granted CP2 LNG's application as to FTA countries in April 2022. CP20014 at 12.

Energy published a notice of the non-FTA portion of the Application in the *Federal Register* on January 10, 2022, and set a deadline of March 11, 2022, for interested parties to submit protests, motions to intervene, notices of intervention, and comments. CP20003. Sierra Club and Natural Resources Defense Council each filed timely motions to intervene and protests. CP20010; CP20011.

In December 2024, while CP2 LNG's non-FTA application was still pending, Energy published a notice of availability of its *2024 LNG Export Study: Energy, Economic, and Environmental Assessment of U.S. LNG Exports* (2024 LNG Export Study), and opened a 60-day public comment period. CP20037. Energy later extended the comment period to 90 days, with comments due on March 20, 2025. CP20040. Energy prepared the 2024 LNG Export Study to provide an updated understanding of the potential economic and environmental effects of U.S. LNG exports. CP20037 at 104133. Energy advised that it did not intend to revise the Study in response to comments but stated that the comments received would inform Energy's public interest determination in non-FTA export application proceedings. CP20037 at 104132.

On January 20, 2026, President Trump issued Executive Order 14154, *Unleashing American Energy*, which directed Energy to "restart reviews of applications for approvals of [LNG] export projects as expeditiously as possible, consistent with applicable law." CP20260 at 8357. The Executive Order also instructed Energy to "consider the economic and employment impacts

to the United States and the impact to the security of allies and partners that would result from granting the application."[4] *Id.*

Consistent with the Executive Order's directive to restart application reviews expeditiously, Energy conditionally approved CP2 LNG's non-FTA export application on March 19, 2025. CP20042. After granting the motions to intervene, Energy concluded that the opponents of the application had "not demonstrated that the requested export authorization would be inconsistent with the public interest under NGA section 3(a)." CP20042 at 6. Energy reserved final decision on the application, however, pending completion of the ongoing comment period on the 2024 LNG Export Study as well as consideration of any additional issues in conjunction with Energy's compliance with NEPA and the NGA. CP20042 at 7.

Energy issued a final order approving CP2 LNG's non-FTA export application on October 21, 2025. Energy found that "the market will be capable of sustaining the level of non-FTA exports requested in CP2 LNG's Application over the authorization term without negative economic impacts that overcome the economic benefits derived from such exports." CP20048 at 44-51. Energy also found that CP2 LNG's exports would benefit U.S. and global

[4] Energy has interpreted the Executive Order as directing it to restart reviews of non-FTA export applications under NGA section 3(a) (not "export projects") as expeditiously as possible. CP20048 at 6 & n. 34.

energy security. CP20048 at 51-54. Finally, Energy concluded that the authorization fell within the scope of Energy's categorical exclusion for authorization to export LNG. CP20048 at 13-15, 55-57.

Sierra Club and Natural Resources Defense Council applied for rehearing of the Authorization Order, arguing that the Exclusion Rule is unlawful, both facially and as applied to the CP2 LNG export authorization, and that Energy arbitrarily and capriciously refused to consider environmental effects other than those resulting from marine transport of LNG, violating both NEPA and the NGA. CP20049 at 3-5.

The rehearing request was deemed denied by operation of law on December 21, 2025, CP20050; *see also* 15 U.S.C. § 717r(a), and Sierra Club and Natural Resources Defense Council petitioned for review in this Court on February 17, 2026. On March 26, 2026, before filing the administrative record, Energy issued the Rehearing Order, which addressed the merits of Sierra Club's rehearing request and reaffirmed the reasoning in the Authorization Order. CP20051 at 24.

## SUMMARY OF ARGUMENT

1. Energy reasonably excluded consideration of environmental effects upstream and downstream of LNG exports from its NGA public interest analysis. Exports of natural gas are presumed by statute to be in the public

interest, and Congress knows that natural gas is exported *for use* abroad. Energy's role in authorizing exports to non-FTA countries is limited to determining whether that presumption has been overcome. In this context, the "public interest" is not a broad license to promote the general welfare. Instead, Energy focuses on ensuring that the proposed exports would not threaten the domestic supply of natural gas or otherwise adversely affect the domestic economy. The NGA does not require Energy to consider upstream and downstream environmental effects as part of its public interest analysis, and Energy reasonably explained why it declined to consider them.

2. Energy properly determined that authorizations to export LNG by marine vessel may be categorically excluded from NEPA's requirement to prepare an environmental impact statement. NEPA does not require agencies to consider environmental impacts upstream or downstream of the project at hand, *i.e.*, the export of LNG. Nor does NEPA require agencies to evaluate the environmental effects of activities outside their regulatory authority. Energy regulates neither the upstream production nor the downstream consumption of natural gas, so it need not consider the effects of those activities in its NEPA analysis.

Energy's analysis of the environmental effects of the marine transport of LNG was sound. Energy examined a wide range of factors and found that

the effects of marine transport were unlikely to be significant. Sierra Club quibbles with that analysis but fails to carry its burden of showing that Energy's conclusion was arbitrary.

Energy reasonably adopted the Exclusion Rule. Energy excluded consideration of upstream and downstream environmental effects from its NEPA analysis because those effects do not have a reasonably close causal relationship to the export conduct authorized. Sierra Club's argument that the categorical exclusion is arbitrary because it is based on the unforeseeability of environmental effects therefore fails.

In any event, Energy reasonably concluded that upstream and downstream effects of LNG exports are by their nature unforeseeable. As to local upstream effects, this Court has upheld Energy's determination that such effects are not foreseeable, in part, because Energy cannot predict the source of the gas to be exported. Upstream greenhouse gas emissions are also not reasonably foreseeable. Although Energy has modeled the increased volume of natural gas production that could be induced by exports, that modeling is uncertain. Further, natural gas production volumes cannot be neatly translated into greenhouse gas emissions because emissions depend, among other things, on production technology and regulatory controls. Finally, translating increased emissions into environmental effects creates an extra layer of

uncertainty. The environmental effects of upstream greenhouse gas emissions are therefore not reasonably foreseeable and may be excluded from Energy's NEPA analysis.

Downstream effects are similarly unforeseeable. Energy exercises no control over the regasification and combustion of exported LNG in destination counties, and emissions from those processes are uncertain. Net greenhouse gas emissions depend in large part on the displacement of other fuels by natural gas, which is also uncertain.

3. Energy reasonably excluded the environmental effects of LNG Terminals from its NEPA analysis. The Energy Policy Act of 2005 assigns FERC exclusive jurisdiction over the construction and operation of LNG Terminals. Because Energy does not exercise regulatory authority over LNG Terminals, it lacks the power to prevent the effects of terminal construction and need not consider those effects in its NEPA analysis. Sierra Club's argument that Energy retains regulatory authority over LNG Terminals assumes that Congress in 2005 delegated authority over LNG Terminals to the Federal Power Commission, an agency that Congress had abolished nearly thirty years earlier. That assumption is implausible.

Even if Energy had residual statutory authority over LNG Terminals, it properly excluded the effects of those terminals from its NEPA analysis.

FERC, not Energy, regulates the siting, construction, and operation of LNG Terminals, and FERC fully considers environmental effects when authorizing new terminals. Energy is not required to review FERC's decisions when evaluating applications to export LNG, and analysis of terminal effects would not inform Energy's export authorization decision. It was therefore reasonable for Energy, in the exercise of its substantial discretion, to exclude those effects from its NEPA analysis.

Sierra Club asserts that Energy must consider terminal effects because some agency must examine "the big picture." Congress already addressed the big picture, however, when it deemed natural gas exports to be presumptively in the public interest. And Congress knew that exported gas must be extracted upstream and that it would be used downstream. Nothing in NEPA or the NGA requires that a single agency consider effects of both LNG Terminals and the export of LNG.

4. If the Court finds that Energy erred, it should not vacate the actions under review. As to the Authorization Order, Sierra Club has not even attempted to show that there is any reason to believe that Energy would have denied the requested authorization had it undertaken the broader analysis Sierra Club urges. Sierra Club therefore fails to show that vacatur is necessary. Vacatur would be inappropriate in any case because it would be highly

disruptive as CP2 LNG expects to begin exports next year, and any weaknesses in Energy's analysis could be addressed through additional explanation. Any flaws in the Exclusion Rule could likewise be addressed through further explanation, so vacatur of the Exclusion Rule is unnecessary.

## STANDARD OF REVIEW

This Court reviews Energy's orders granting or denying authorization to export natural gas under the deferential arbitrary and capricious standard. *Sierra Club v. Dep't of Energy* (*Freeport II*), 867 F.3d 189, 196 (D.C. Cir. 2017). "When conducting arbitrary-and-capricious review, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Cumberland*, 153 F.4th at 1304 (quotation omitted). Review is at its most deferential when the agency's decision rests on technical expertise and predictive judgments. *See Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983). Energy's findings of fact, "if supported by substantial evidence, shall be conclusive." 15 U.S.C. § 717r(b); *Alaska LNG*, 134 F.4th at 575.

"[T]he central principle of judicial review in NEPA cases is deference." *Seven Cnty.*, 605 U.S. at 179. Courts should not "micromanage" the scope of an agency's NEPA analysis so long as it falls "within a broad zone of reasonableness." *See id.* at 183. That deference extends not only to the substance of

the agency's NEPA analysis but also to the agency's "policy-laden choices about the depth and breadth of its inquiry." *Id.* The petitioner bears the burden of demonstrating that Energy's NEPA analysis was arbitrary. *See El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 246 (D.C. Cir. 2024).

**ARGUMENT**

Sierra Club challenges the Authorization Order on two grounds: First, it says that the Order violates the NGA because Energy declined to consider upstream and downstream greenhouse gas impacts of LNG exports as part of its public interest analysis. Second, it argues that the Authorization Order violates NEPA because it relied on the Exclusion Rule, which it says is arbitrary because it does not consider environmental effects upstream and downstream of LNG export activities or account for the environmental effects of LNG Terminals authorized by FERC.

Those arguments fail. As to the NGA, the public interest standard is not "a broad license to promote the general welfare," *NAACP*, 425 U.S. at 669, and nothing in the statute requires Energy to consider indirect environmental effects as part of its public interest analysis. As to NEPA, the Supreme Court has been clear that agencies are required to assess the environmental impacts only of the project at hand and need not "consider the environmental effects of upstream and downstream projects that are separate in time or

place." *Seven Cnty.*, 605 U.S. at 179. Energy therefore properly limited its environmental analysis in the Exclusion Rule to the environmental effects of LNG export activities. Energy also properly excluded environmental effects of LNG Terminals, because the NGA vests exclusive jurisdiction over construction and operation of LNG Terminals in FERC, not Energy. The petitions for review should be denied.

## I. The NGA does not require Energy to consider upstream or downstream environmental effects when authorizing exports of LNG.

The NGA *requires* Energy to authorize export of natural gas unless it finds that the proposed exports "will not be consistent with the public interest." 15 U.S.C. § 717b(a). In accordance with that charge and its longstanding practice, Energy's evaluation of CP2 LNG's application under the public interest standard focused on (i) the domestic need for the natural gas proposed to be exported, (ii) whether the proposed exports pose a threat to the security of domestic natural gas supplies, (iii) whether the arrangement is consistent with Energy's policy of promoting market competition, and (iv) other factors Energy deemed appropriate under the circumstances, including economic and energy security considerations. CP20048 at 26; CP20051 at 24. In light of those considerations and the evidence presented—and after completing its NEPA review (below, pt. II)—Energy determined that it had "not been shown

that a grant of the requested authorization will be inconsistent with the public interest" and granted the application. CP20048 at 64.

Sierra Club says that conclusion was arbitrary because the NGA required Energy to evaluate upstream and downstream environmental effects of exports, Br. 55, and to consider those effects when determining whether the "export project's benefits outweigh its harms," Br. 42. Sierra Club misunderstands Energy's role.

First, the NGA does not authorize Energy to engage in an open-ended weighing of the benefits and harms of exports. "[W]ith respect to exporting natural gas, the Natural Gas Act is not neutral. Congress expressed a preference for permitting exports, so long as our nation has an abundance of this natural resource, as it does." *Alaska LNG*, 134 F.4th at 572; *accord Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1188 (D.C. Cir. 2023). Thus, Energy may deny authorization *only* if the evidence presented in the individual authorization proceeding is sufficient to overcome the statutory presumption that exports are in the public interest.

Second, as the Supreme Court has held, the NGA's "public interest" standard is not "a broad license to promote the general welfare." *NAACP*, 425 U.S. at 669. Rather, Energy's "charge" is to "promote the orderly production of plentiful supplies of … natural gas at just and reasonable rates." *Id*. at 670.

Energy implements that charge by focusing on the effects of exports on domestic natural gas supplies. CP20048 at 26; CP20051 at 24. Though Energy may consider other factors in its discretion, it is "clearly not required by NGA section 3(a) to consider the upstream and downstream environmental effects of proposed exports." CP20051 at 24.

Sierra Club's argument that Energy was required to consider environmental effects as part of its public interest analysis rests on dicta from *NAACP*, in which the Court observed that the NGA and the Federal Power Act contain "subsidiary purposes," such as "conservation, environmental, and antitrust questions." *NAACP*, 425 U.S. at 670 & n.6. But the Court never said that those subsidiary purposes were relevant to every decision made under the Acts. *NAACP* concerned regulation by the former Federal Power Commission. *Id.* at 663. Most of the Federal Power Commission's NGA authorities are now administered by FERC, and environmental considerations are relevant to some of those authorities. For example, FERC considers environmental effects when licensing the construction of new LNG Terminals because the construction has direct effects on the surrounding environment. By contrast, Energy's role in authorizing exports is focused on evaluating the effect of exports on natural gas supplies, which does not require

consideration of environmental effects, and nothing in *NAACP* suggests that Energy is required to consider them. CP20051 at 24.

Moreover, the Supreme Court referred to environmental questions as only a "subsidiary purpose" of the NGA. *Id.* A "subsidiary" purpose is "of secondary importance." *Webster's Third New International Dictionary* 2279 (1976). Accordingly, environmental considerations cannot override the Act's "principal purpose," the "development of plentiful supplies of … natural gas." *NAACP*, 425 U.S. at 669-70; *see also* CP20051 at 35. And, absent extraordinary circumstances, Energy could not prohibit exports that would otherwise be in the public interest on the basis of environmental considerations. CP20051 at 35. Thus, the NGA forbids what Sierra Club demands: that Energy attempt to limit indirectly the amount of natural gas produced in the United States and consumed abroad (and associated greenhouse gas emissions) by denying export authorization on environmental grounds.

The other cases Sierra Club relies on provide no more support. Sierra Club cites *Freeport II* for the proposition that the NGA requires Energy to consider environmental effects in its public interest analysis, but *Freeport II* merely upheld Energy's consideration of environmental factors in that specific case. It did not hold that Energy is always required to consider environmental effects or that environmental concerns could outweigh other public

interest considerations, such as the sufficiency of the domestic natural gas supply. *See Freeport II*, 867 F.3d at 202-03. Sierra Club also cites *N.J. Conservation Found. v. FERC*, 111 F.4th 42, 62 (D.C. Cir. 2024) (quoting *City of Oberlin v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019)) and *Sierra Club v. FERC* (*Sabal Trail*), 867 F.3d 1357, 1373 (D.C. Cir. 2017), *abrogation recognized by Cumberland*, 153 F.4th 1295, for the proposition that the NGA authorizes Energy to deny a project on the basis of adverse environmental effects, Br. 54. But those cases concerned section 7 of the NGA, which "differs significantly" from section 3. *W. Va. Pub. Servs. Comm'n v. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982). Unlike section 3, section 7 does not create a presumption in favor of authorization. *Id.* Those cases are thus inapplicable to Energy's export authorization decisions.

Nor is the analysis changed because Energy has in the past considered environmental effects as part of its public interest analysis. First, although Energy has previously considered environmental effects, it has never denied an export authorization for environmental reasons and thus never had to address whether it would have the statutory authority to do so.[5] Second, Energy reasonably explained why it "believes" its new approach "to be better." *FCC*

[5] In past export orders, Energy has addressed environmental concerns as a subsidiary matter, for example by conditioning export authorization on compliance with certain environmental conditions. *E.g.*, CP20060 at 97.

*v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Energy emphasized its longstanding policy that the public interest analysis should focus on the domestic need for the natural gas to be exported and whether exports would threaten the security of domestic natural gas supplies. CP20048 at 56-57; CP20051 at 23-25. It added that the NGA contains no textual indication that environmental considerations could override the Act's presumption in favor of exports. CP20051 at 24-25. Accordingly, Energy determined that it would not, as a matter of policy, continue to factor environmental concerns into its public interest analysis. No more was required for Energy to alter its approach. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

Once the scope of Energy's public interest analysis is properly understood, the other flaws in Sierra Club's arguments become apparent. Sierra Club argues that Energy acted inconsistently, and therefore arbitrarily, by considering the upstream and downstream economic effects of exports without also considering upstream and downstream environmental effects, Br. 43, 63, 64, but there is no inconsistency. Energy considered how the production of natural gas would change in response to additional exports because that effect is germane to whether additional exports would cause domestic supply shortages or unreasonable price increases. But the environmental effects of increased natural gas production are not relevant to those questions,

and the NGA does not require Energy to consider them. Similarly, Energy chose in its discretion to consider the downstream national and global security ramifications of authorizing LNG exports, but in choosing to do so, it did not obligate itself to consider other downstream effects that it reasonably determined should be excluded (and that the statute did not require it to consider). *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 658 (D.C. Cir. 1989) (discussing the FCC's broad discretion under the Communication Act's "public interest" standard).

The NGA codifies Congress's policy that exports of natural gas are presumptively in the public interest. Energy would act beyond its statutory authority if it attempted to thwart that policy by refusing to issue export authorizations in an effort to limit indirectly greenhouse gas emissions from the production or consumption of natural gas. Energy therefore reasonably excluded upstream and downstream environmental effects from its public interest analysis.

## II. Energy reasonably adopted the Exclusion Rule.

As Energy explained in the Exclusion Rule and in the Authorization Order, the only environmental effects of the authorization properly considered in the NEPA analysis are the direct effects of its decision to authorize exports, *i.e.*, the effects of transporting LNG by vessel. DOE0001 at 78198;

CP20048 at 13-14, 55; CP20051 at 27. Energy thoroughly analyzed those effects in the Exclusion Rule and determined that marine transport of LNG "normally does not pose the potential for significant environmental impacts." DOE0001 at 78198. Energy therefore adopted a categorical exclusion for authorizations to export natural gas by marine vessel. Energy reasonably relied on that categorical exclusion to fulfill its NEPA obligations when approving CP2 LNG's non-FTA export application. NEPA requires no more.

Sierra Club argues that the Exclusion Rule is unlawful primarily because it does not address upstream and downstream environmental effects of authorizing LNG exports. [6] But the Supreme Court and this Court have been clear that NEPA only requires analysis of the "project at hand." And Sierra Club's other arguments fail to show that Energy's analysis in the Exclusion Rule was arbitrary.

### A. NEPA does not require consideration of upstream or downstream environmental effects.

NEPA does not require Energy to evaluate the upstream and downstream effects of authorizing LNG exports. The Supreme Court held unequivocally in *Seven County* that NEPA requires analysis only of the "project at

---

[6] Sierra Club says in passing that the Exclusion Rule is unlawful, both facially and as applied. Br. 24. Sierra Club makes no argument specific to the orders under review, however, so there is no separate as-applied challenge.

hand, not other future or geographically separate projects." 605 U.S. at 187. Accordingly, NEPA does not require agencies "to consider the environmental effects of upstream and downstream projects that are separate in time or place" from the action under consideration. *Id.* at 179. The upstream and downstream effects Sierra Club says Energy failed to consider all involve separate "projects" that are geographically and temporally removed from the export of LNG. Energy therefore properly excluded consideration of upstream and downstream effects when it adopted the Exclusion Rule.

Energy was not required to assess upstream and downstream effects for a second, independent reason: NEPA does not require agencies to assess environmental effects they lack statutory authority to prevent. In *Public Citizen*, the Supreme Court held that NEPA requires agencies to analyze only those environmental effects that bear "'a reasonably close causal relationship,' between the environmental effect and the alleged cause," similar to the tort concept of "proximate cause." *Public Citizen*, 541 U.S. at 767 (quoting *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983)). An agency "cannot be considered a legally relevant 'cause' of [an] effect" if the agency "has no ability to prevent" that effect. *Id.* Accordingly, agencies need not consider every environmental effect their action "will make possible," but only those "over which they … exercise regulatory

authority." 153 F.4th at 1295, 1311 (quoting *Seven County*, 605 U.S. at 188, and *Sabal Trail*, 867 F.3d at 1371).

As explained above, pp. 23-26, Energy's authority under the NGA is limited to evaluating whether particular exports of natural gas would not be in the public interest. Energy has no authority to regulate the production, transportation, or liquefaction of natural gas within the United States, and it certainly has no authority to regulate the use of natural gas in foreign countries. It therefore "has no ability to prevent" the very environmental effects Sierra Club says it must consider. Energy is thus not a legally relevant cause of those effects, and Energy was not required to consider them in its NEPA analysis.

Sierra Club ignores that caselaw and argues that Energy needed to evaluate upstream and downstream impacts because those effects are "foreseeable" and "relevant to DOE's decisionmaking notwithstanding DOE's lack of direct regulatory authority." Br. 45-46. But that is not the test. "The effects from a separate project *may be factually foreseeable*, but that does not mean that those effects are relevant to the agency's decisionmaking process or that it is reasonable to hold the agency responsible for those effects." *Seven Cnty.*, 605 U.S. at 187 (emphasis added). Energy has no authority to regulate the production, liquefaction, or transportation of natural gas within the United

States. Nor does Energy exercise any authority over the regasification and use of LNG in foreign countries. Energy is therefore not required to analyze the environmental effects of those separate projects. *See Cumberland*, 153 F.4th at 1295, 1311.

Sierra Club does not dispute that Energy has no authority to regulate upstream and downstream activities. It argues, however, that because the NGA requires Energy to consider "effects going beyond what the agency directly regulates," it must also consider upstream and downstream effects in its NEPA analysis. Br. 60. That argument is just an attempt to resurrect this Court's holding in *Sabal Trail* that an agency's NEPA analysis must assess effects related to those "factors" that the agency may "consider when regulating in its proper sphere." 867 F.3d at 1373. But this Court held in *Cumberland* that *Sabal Trail*'s analysis does not survive *Seven County*. 153 F.4th at 1311. And, as explained above, pp. 28-29, the fact that expected changes in natural gas production are relevant to Energy's export authorization analysis does not mean that the environmental effects of those changes are also relevant.

In another false equivalence, Sierra Club argues that Energy does not regulate natural gas supplies or prices, yet considers upstream and downstream supply effects, so the same must hold for environmental effects. Br.

60. While the market, and not Energy, sets natural gas prices, Energy exercises regulatory authority over exports and thus authorizes exports only after determining that they would not disrupt domestic supplies. *See* CP20048 at 26. It is therefore reasonable for Energy to consider the effects of exports on domestic supply, but not upstream environmental effects of natural gas production.

Contrary to Sierra Club's presentation, Energy's role in authorizing the export of LNG is closely analogous to the roles of the agencies in *Public Citizen* and *Seven County*. In *Public Citizen*, Mexican motor carriers could not obtain authority to operate within the United States until the Federal Motor Carrier Safety Administration promulgated safety-monitoring regulations for Mexican carriers. 541 U.S. at 761. The Supreme Court held that NEPA did not require the Administration to analyze the environmental effects of increased trade between the United States and Mexico, which was a factually foreseeable effect of the regulations, because the Administration was not responsible for determining whether Mexican carriers should be permitted to operate in the United States, but only for determining the safety regulations that would apply if the carriers were authorized. Similarly, the NGA does not empower Energy to determine how much natural gas should be produced in the United States or consumed abroad. Its authority extends only to

determining whether exports of domestically produced natural gas to non-FTA countries (here, in the form of LNG) to non-FTA countries would be contrary to the public interest within the meaning of the NGA.

*Seven County* addressed the Surface Transportation Board's decision to approve the construction and operation of a new rail line to serve the Uinta Basin in Colorado. The main economic justification for the new rail line was to "provide oil producers a more efficient option for transporting oil out of the Basin to refineries," with the expectation that the rail line would lead to increased oil production. 605 U.S. at 175. The Supreme Court upheld the Board's decision not to consider the upstream effects of increased oil drilling or the downstream effects of increased oil refining because those are not effects of constructing a new rail line. *Id.* at 187; *id.* at 198-99 (Sotomayor, J., concurring). So too in this case. Energy's authorization to export LNG may foreseeably lead to increased natural gas production and increased natural gas combustion, but both those effects are "outside [Energy's] authority and would be initiated, if at all, by third parties." *Seven Cnty.*, 605 U.S. at 187. As a result, they are not effects of the "project at hand" and need not be part of Energy's NEPA analysis. *Id.*

### B. Energy's ship traffic analysis was sound.

Having properly concluded that its NEPA analysis of export authorizations should be limited to the effects of exporting activities, Energy reasonably determined that environmental effects associated with the marine transport of LNG are not expected to be significant. Energy reviewed the literature on LNG shipping, including studies on vessel safety, spill risks, terrorism risks, air quality effects, ecological effects, and effects on protected species, and summarized those studies in a Technical Support Document. *See generally* DOE0042. That review observed that LNG has been shipped by marine vessel for over fifty years "without a major release of cargo or a major accident." *Id.* at 9. Energy also determined that LNG exports are not a significant contributor to marine vessel traffic overall, observing that in 2019 "LNG shipments comprise[d] less than one percent of vessel calls from U.S. ports annually." DOE0001 at 78202. Finally, Energy relied on an earlier environmental impact statement prepared for an LNG export project on the Gulf of America to conclude that "ship strikes are not anticipated" to adversely affect federally listed whales or sea turtles. DOE0042. at 8.

In response, Sierra Club makes three quibbles (i) that Energy's analysis of ship traffic did not account for the fact that LNG shipping is concentrated in the Gulf of America, (ii) that Energy did not consider that the volume of

ship traffic might grow to become significant, and (iii) that Energy did not consider that even marginal increases in ship traffic could adversely affect the endangered Rice's whale. None of those points is sufficient to meet Sierra Club's burden of showing that Energy's analysis of ship traffic was arbitrary.

At a general level, each of Sierra Club's criticisms goes to the depth of Energy's analysis. Sierra Club thinks that Energy should have conducted a more granular analysis of shipping volumes and more thoroughly investigated effects on Rice's whale. Energy is entitled, however, to "substantial deference" regarding its "fact-dependent, context-specific, and policy-laden choices about the depth and breadth" of its NEPA analysis. *Seven Cnty.*, 605 U.S. at 183. As long as those choices "fall within a broad zone of reasonableness," Energy's conclusions must be upheld. *Id.*

1. It was reasonable for Energy to rely on nation-wide shipping statistics to assess the likelihood that LNG exports will meaningfully increase ship traffic. Energy was considering a categorical exclusion applicable to all LNG exports, not just those from the Gulf of America. Further, Energy's analysis of national figures indicated that traffic increases due to LNG shipments were likely to be less than one percent of total ship traffic. DOE0001 at 78202. Even if the increase might be greater in some regions, the minimal share of national traffic attributable to LNG transport suggests that regional

increases would also not be significant. *See Beyond Nuclear, Inc. v. Nuclear Regul. Comm'n*, ___ F.4th ___, 2026 WL 2093882 at *6 (D.C. Cir. 2026) (upholding an agency's reliance on "large margins" to account for uncertainties). Nor does Sierra Club offer any evidence to back its speculation that increases in vessel traffic in the Gulf of America due to LNG exports are significant. Sierra Club cannot overcome the substantial deference due Energy's analysis by tossing out possibilities. It must provide some basis to conclude that its concerns are substantial. *See El Puente*, 100 F.4th at 246.

2. Sierra Club is also mistaken that Energy did not consider the possibility that the number of LNG shipments would increase. In the Exclusion Rule, Energy noted that LNG shipments had increased two-and-a-half fold between 2017 and 2019 but concluded that even with increased exports "the relative proportion of LNG shipments to total shipping is not expected to change substantially." DOE0001 at 78202; *see also* CP20051 at 44. Sierra Club again engages in speculation, suggesting that the number of LNG shipments could increase from 563 in 2019 to more than 5,800 by 2050. Br. 68. That guesstimate, however, is based on a hypothetical modeling scenario that was not intended to be a forecast of actual future exports. *See* CP20036 at S-v. Given the small percentage of U.S. vessel traffic attributable to LNG shipments, it was reasonable for Energy to "decline[] to expend further

resources on an attempt to model" future ship traffic. *Beyond Nuclear*, at 17. That is "precisely the type of judgment call about the depth and breadth of an environmental analysis to which [courts] must defer." *Id*.

3. Finally, Sierra Club simply ignores the fact that Energy considered the effects of LNG shipments on endangered species, including Rice's whale. DOE0042 at 8; DOE0060 at 4-142–43. Sierra Club may disagree with Energy's analysis, but disagreement is insufficient to show that analysis was arbitrary, *El Puente*, 100 F.4th at 246, and Sierra Club has offered no evidence or analysis to demonstrate that Energy unreasonably concluded that effects on whales are unlikely to be significant. *See Balt. Gas*, 462 U.S. at 103-05.

It is always possible to do more analysis, but more analysis is not always better. *See Appalachian Voices v. FERC*, 139 F.4th 903, 916 (D.C. Cir. 2025) (Henderson, J., concurring) (observing that lawsuits demanding agencies engage in additional analysis create administrative burdens that inhibit beneficial development). And rarely is more analysis mandated by NEPA. *See Seven Cnty.*, 605 U.S. at 183-84. Energy undertook a good-faith analysis of the likely environmental effects of transporting LNG by ship and reasonably concluded that those effects are unlikely to be significant. That is all NEPA requires.

### C. Energy properly adopted the Exclusion Rule.

Energy adopted the Exclusion Rule based on its determination that its NEPA analysis is properly limited to the effects of export activities and that those activities are normally not expected to have significant effects on the environment. Yet Sierra Club puzzlingly argues that the Exclusion Rule is invalid because it is based on "unforeseeability." Br. 51. Putting aside whether a categorical exclusion may ever be based on unforeseeability—a question the Court need not decide—unforeseeability was not the basis for the Exclusion Rule. It was based on the limited scope of effects caused by export authorization decisions. *See* DOE0001 at 78197. Sierra Club compounds its error by arguing that upstream and downstream environmental effects are foreseeable. Br. 52-53. They are not, below pt. II.D, but that is beside the point. Energy excluded those effects from its consideration because they lack a sufficient causal connection to the authorized export activities. DOE0001 at 78199. Energy's conclusion on causation is sound, whether or not upstream and downstream effects are foreseeable. *See Seven Cnty.*, 605 U.S. at 187 ("The effects from a separate project may be factually foreseeable, but that does not mean that those effects are relevant to the agency's decisionmaking process.").

### D. Energy reasonably determined that upstream and downstream effects are not foreseeable.

Energy also supportably concluded that the upstream and downstream effects of authorizing LNG exports "are not reasonably foreseeable for NEPA purposes." DOE0001 at 78200. As with other aspects of an agency's NEPA analysis, agencies exercise "substantial discretion" in determining whether an effect is sufficiently foreseeable that it should be considered in the agency's decision. *See Seven Cnty.*, 605 U.S. at 181. Energy's findings that upstream and downstream environmental effects are too uncertain to be considered in its NEPA analysis is a "finding of fact" that is "conclusive" if "supported by substantial evidence" *Alaska LNG*, 134 F.4th at 575 (quoting 15 U.S.C. § 717r(b)). Sierra Club fails to meet its heavy burden to show that Energy's conclusions are not supported by substantial evidence or are otherwise arbitrary. *El Puente*, 100 F.4th at 246.

#### 1. Upstream effects

"Upstream effects" are those effects stemming from the production and transportation of natural gas before export. Effects related to the construction and operation of LNG Terminals are a category of upstream effects, but are addressed separately in section III, below, consistent with Sierra Club's separate presentation of those issues. Energy reasonably concluded that both "local" upstream effects and effects from upstream

greenhouse gas emissions are not sufficiently foreseeable to be weighed in the NEPA analysis.

"Local" upstream effects are effects on the local environment where natural gas is produced. When it issues export authorizations, Energy typically has no way of knowing where the natural gas to be exported will be produced. Natural gas reservoirs occur throughout the United States, and long-distance pipelines allow for gas from a wide geographic area to be delivered to an LNG Terminal for export. CP20083 at 73-74. Because local environmental effects depend on the particular characteristics of the local environment where the gas is produced, Energy is unable to evaluate those effects meaningfully. *Id.* As Sierra Club notes, Br. 49, this Court has upheld Energy's determination that local upstream effects are insufficiently foreseeable to be useful to the decisionmaking process. *Freeport II*, 867 F.3d at 198-99.

Sierra Club counters that greenhouse gas emissions associated with upstream natural gas production are foreseeable and that it was arbitrary for Energy to conclude otherwise. Sierra Club argues that because Energy expects natural gas production to increase roughly by the amount of increased exports, it could also foresee the additional greenhouse gas emissions that would result from the increased production. Br. 48. Sierra Club

relies on Energy's 2014 *Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States*, which estimated that each additional trillion cubic feet of natural gas produced will result in additional greenhouse gas emissions of 6.8 million metric tons $CO_2$ equivalent (declining to 5.8 million metric tons by 2035). As the discussion in the Addendum shows, however, that estimate is uncertain and assumption-dependent. CP20078 at 40-42. More importantly, the environmental effects of any increased emissions are themselves uncertain. Greenhouse gas emissions from domestic natural gas production are expected to account for only a small percentage of overall greenhouse gas emissions, *id.* at 43-44, and the environmental consequences of incremental increases in greenhouse gas emissions are themselves difficult to foresee, *id.* at 44. Moreover, the net greenhouse gas impact of increased production depends on the fuels that additional U.S. LNG exports replace. *Id.* Given those uncertainties, Energy's determination that upstream greenhouse gas emissions are too uncertain to inform the NEPA analysis was not arbitrary. DOE0001 at 78201-02; DOE0062 at 73-76.

### 2. Downstream effects

Energy also reasonably concluded that downstream effects—effects related to the regasification and consumption of LNG in the destination

country—are not foreseeable. DOE0001 at 78200. Based on the high degree of uncertainty in predicting the effects of exports on downstream emissions, Energy determined in export authorization orders issued before the Exclusion Rule that downstream emissions are not sufficiently foreseeable to be included in the NEPA analysis. *E.g.*, CP20060 at 82. This Court upheld that determination in *Freeport II*, 867 F.3d at 202, and Energy relied on that precedent to conclude in the Exclusion Rule that downstream emissions are "too attenuated to be reasonably foreseeable." DOE0001 at 78200. The Court again affirmed that point in *Alaska LNG*, holding that "impacts of downstream emission in foreign countries are not reasonably foreseeable." 134 F.4th at 575. Energy therefore appropriately excluded downstream emissions from the scope of its NEPA analysis.

Sierra Club relies on the 2024 LNG Export Study to argue that downstream emissions are foreseeable, Br. 50, but that Study concluded that changes in greenhouse gas emissions due to increased U.S. LNG exports are both highly uncertain and assumption-dependent.[7] CP20036 at S-41. It

[7] Sierra Club also cites Energy's 2019 *Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States*, which evaluated the expected net change in global greenhouse gas emissions from exports of U.S. natural gas under various scenarios. That study concluded that U.S. LNG exports would not cause a net increase in global greenhouse gas

thus does not undermine Energy's conclusion that downstream emissions are "too attenuated to be reasonably foreseeable." DOE0001 at 78200. In any event, the 2024 LNG Export Study postdates the Exclusion Rule, and Energy declined to consider the Study's environmental analysis when evaluating CP2 LNG's export application. CP20048 at 17-18.

## III. Energy properly excluded terminal effects because it lacks authority over the construction and operation of LNG Terminals.

### A. Energy lacks statutory authority to regulate the construction or operation of LNG Terminals.

Through the Energy Policy Act of 2005, Congress amended the NGA to confer "exclusive authority" on the "Commission" to "approve or deny an application for the siting, construction, expansion, or operation of an LNG Terminal." Pub. L. No. 109-58, § 311, 119 Stat. 594, 686 (2005). The Act does not define "Commission," but in context it is clear that Congress intended for "Commission" to mean FERC. A statutory term's "ordinary meaning at the time of enactment usually governs," *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020), and in 2005, the only federal "Commission" with regulatory authority over natural gas facilities was FERC. The legislative history confirms

---

emissions in the scenarios studied but also emphasized the highly uncertain nature of the analysis. CP20137 at 32.

that Congress understood that FERC would regulate the construction and operation of LNG Terminals following passage of the Act. The statute must therefore be read as conferring "exclusive authority" on FERC to regulate the construction and operation of LNG Terminals, with the corollary that Energy lacks such authority.

Sierra Club's contrary position is unconvincing. Sierra Club points out that when the Energy Policy Act amended the NGA, it left untouched the NGA's preexisting definition of "Commission" as the "Federal Power Commission." 15 U.S.C. § 717a(9). Therefore, Sierra Club says, when Congress used the term "Commission" in the Energy Policy Act, it was referring to the Federal Power Commission. The problem with Sierra Club's reasoning is that the Federal Power Commission was abolished in 1977. 42 U.S.C. § 7151(b). It would make no sense for Congress, legislating in 2005, to delegate authority to an agency that had not existed for nearly thirty years. Rather, "Commission" should be read in the way it would have been understood by members of Congress when the Energy Policy Act was drafted, debated, and passed: as the "Federal Energy Regulatory *Commission*." *See BP p.l.c. v. Mayor & City Council of Balt.*, 593 U.S. 230, 237 (2021) ("[T]his Court generally seeks to discern and apply the ordinary meaning of [a statute's] terms at the time of their adoption."). Further, the "Definitions" section of the NGA says that the

defined terms will bear the meanings provided "unless the context otherwise requires." 15 U.S.C. § 717a. Given that the Federal Power Commission was long gone in 2005, the context of the Energy Policy Act "requires" that the term "Commission" be given its then-current meaning: FERC.

To bolster its argument, Sierra Club cites two post-2005 decisions of this Court that describe FERC's authority over LNG Terminals as being delegated from Energy. Br. 3. But the parties in those cases never litigated whether FERC's authority derived from statute or Energy's delegation. *See Alaska LNG*, 134 F.4th at 570 n.2; *Sierra Club v. FERC (Freeport I)*, 827 F.3d 36, 40-41 (D.C. Cir. 2016). Thus, those statements are dicta and cannot be said to represent the Court's considered view of the proper interpretation of the Energy Policy Act. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) (Scalia, J., dissenting) (explaining that "judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed" and collecting cases).

If there were any doubt as to the meaning of "Commission" in the Energy Policy Act, the legislative history dispels it. Committee reports from both houses, as well as individual members' statements show that when Congress was debating the Act, it understood "Commission" to mean FERC. *See, e.g.*, House Report 109-49 at 7 (Apr. 19, 2005) (["T]he Federal Energy

Regulatory Commission (FERC), would be made the lead federal agency for LNG siting decisions."); Senate Report 109-78 at 29 (June 9, 2005) (Section 311 "clarifies FERC's exclusive jurisdiction under the [NGA] for siting, construction, expansion and operation of import/export facilities."); *see also, e.g.*, statement of Sen. Feinstein, 151 Cong. Rec. 13607 (2005) ("This Energy bill would give the Federal Energy Regulatory Commission, known as FERC, exclusive authority over siting onshore liquefied natural gas facilities.").

Sierra Club's objection that the legislative history reflects only the regulatory practice at the time of the Act's passage, rather than a purposeful decision by Congress to vest exclusive authority in FERC, misses the point. Br. 36-37. The legislative history shows that when Congress used the word "Commission," it understood "Commission" to mean FERC. Indeed, the fact that FERC was responsible for regulating LNG Terminal construction at the time of the Act's passage reinforces the conclusion that Congress intended to assign authority for that task to FERC. As Sierra Club points out, Br. 37, Congress's primary objective in section 311 was to endorse FERC's assertion of exclusive federal jurisdiction over the permitting of LNG Terminals. *See* H.R. Rep. 109-49 at 7. In other words, the legislative history shows that Congress wanted to codify the regulatory status quo, in which FERC, not Energy, exercised authority to regulate LNG Terminals.

The delegation orders cited by Sierra Club do not require a different conclusion. Obviously, administrative orders cannot change a statute's meaning, and as Sierra Club notes, Energy's interpretation of the statute is not entitled to deference. Br. 34 (citing *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 392 (2024)). Nor do the delegation orders reflect Energy's considered interpretation of the Energy Policy Act. Rather, the language Sierra Club cites from the 2006 and 2023 delegation orders was carried over from earlier delegation orders that pre-dated the Act. *See* Delegation Order Nos. 0204-111 & 0204-112, 49 Fed. Reg. 6672, 6690 (Feb. 22, 1984) (containing the language Sierra Club relies on from the 2006 and 2023 delegation orders). Indeed, when promulgating the Exclusion Rule in 2020, Energy took the position that "FERC has exclusive statutory authority to approve construction and operation of natural gas export facilities." DOE0001 at 78199. By inadvertently retaining the earlier language in the post-2005 delegations, Energy did not intend to preserve authority over the construction and operation of LNG Terminals. Nor has there been any ongoing interagency process to indicate that Energy did, in fact, preserve such authority.

### B. Even if Energy had authority over the construction of LNG Terminals, those effects would be properly excluded.

Even if Sierra Club were right that Energy retains residual authority to regulate LNG Terminals, it would still be proper for Energy to exclude those effects from its NEPA analysis of LNG export authorizations. As the Supreme Court explained in *Seven County*, the scope of the analysis required by NEPA is defined by the "the project at hand," and as long as the agency addresses environmental effects from that project, "courts should defer to agencies' decisions" regarding the scope of the analysis. 605 U.S. at 182. The "project at hand" is the authorization of natural gas exports to non-FTA countries. DOE0001 at 78197 & n.9. In evaluating whether to issue such authorizations, Energy need not consider the construction or operation of any LNG Terminal; it need evaluate only whether it would be contrary to the public interest to permit export of the requested volume of natural gas. Environmental effects related to facility construction and operation are not relevant or useful to that inquiry. *See Seven Cnty.*, 605 U.S. at 181. Energy thus appropriately excluded those effects from the scope of its NEPA analysis.

As noted above, "agencies are not required to analyze the effects of projects over which they do not *exercise* regulatory authority." *Seven Cnty*, 605 U.S. at 188 (emphasis added). Regardless of the source of its authority, there

is no dispute that FERC exercises regulatory authority over the construction and operation of LNG Terminals, or that FERC exercises that authority independently. Thus, as a practical matter, there are two separate regulatory "projects" undertaken by two distinct regulatory agencies. Even if Energy were found to have retained some residual authority over construction of LNG Terminals, the delegation orders limit that authority to disapproving FERC decisions. CP20058 at 4. And nothing in the delegation orders would require Energy to consider whether to exercise that disapproval authority in every case. Thus, there would be no need for Energy to evaluate effects from LNG Terminal construction whenever it authorized the export of LNG to non-FTA countries. And in this case, no party asked Energy to disapprove FERC's licensing decision nor is there any indication that Energy considered doing so.

Because Energy does not in fact "exercise regulatory authority" over LNG Terminals, the environmental effects of those terminals are not germane to the "project at hand." In *Seven County*, the Supreme Court stressed that the scope of an agency's NEPA analysis should be guided by the "usefulness of any new potential information to the decisionmaking process." 605 U.S. at 181 (quoting *Public Citizen*, 541 U.S. at 767). Environmental effects associated with construction and operation of LNG Terminals would not be

useful to Energy in determining whether exports of natural gas would be inconsistent with the public interest, because that inquiry is focused on the effect of exports on domestic natural gas supplies. It was therefore appropriate for Energy, in the exercise of its substantial discretion, to define the scope of its NEPA analysis to exclude LNG Terminal effects from its consideration. *See Seven Cnty.*, 605 U.S. at 183; *Cumberland*, 153 F.4th at 1308.

Nor are CP2 LNG's respective applications for authority to construct and operate an LNG Terminal and for authority to export LNG to non-FTA countries "connected actions" that must be evaluated in the same NEPA document. As a preliminary matter, Sierra Club forfeited any argument that terminal construction and export authorization are connected actions by limiting its argument to a six-line footnote. Br. 34 n.4; *see CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014). In any event, the actions are not connected. As Energy explained in the Exclusion Rule, "[Energy's] and FERC's approval actions are not interdependent." DOE0001 at 78199 & n.27. A grant of authorization to export LNG to non-FTA countries does not guarantee that an LNG Terminal will be built, and in fact there have been multiple instances when Energy has granted export authorization, only for the applicant to later request that the authorization be vacated. CP20048 at 57-59 & n.320. Export authorization decisions and terminal construction decisions thus can be—

and in practice are—made independently of one another. It is therefore unnecessary for the environmental effects of one to be considered in the NEPA analysis of the other. *See Seven Cnty.*, 605 U.S. at 188; *Cumberland*, 153 F.4th at 1308.

Further, *Seven County* made clear that agencies are required to consider the environmental effects of only the project at hand. 605 U.S. at 188. As this Court explained in *Cumberland*, that holding rested "on the text of NEPA itself," which is focused on the "proposed agency action." *Cumberland*, 153 F.4th at 1308 (citing 42 U.S.C. § 4332(2)(C)). NEPA's text does not require agencies to broaden their analysis beyond the "proposed agency action" to include other actions merely because they may possess some authority over those actions. To the extent that the former NEPA regulations required more, the statute controls, *id.*, and those regulations have been repealed, 90 Fed. Reg. 10616 (Feb. 25, 2025).

### C. Neither the NGA nor NEPA requires that a single agency examine "the big picture" on exports.

Sierra Club's final argument for requiring Energy to consider LNG Terminal effects is that "there must be some agency that considers the big picture," Br. 44, by which Sierra Club means that some agency must weigh both the costs and benefits of LNG Terminal construction and the costs and benefits of LNG exports—including the environmental costs—to determine

whether both are in the public interest. Sierra Club conspicuously cites no authority for that novel proposition, and it does not withstand analysis.

First, the NGA does not authorize Energy or FERC to engage in an open-ended balancing of the costs and benefits of natural gas extraction, liquefaction, export, and use. Above, pp. 23-26. Rather, Congress considered "the big picture" and determined that the export of natural gas is presumptively in the public interest. And Congress knew when it did so that exported natural gas would be used in the destination country, resulting in emissions. There is no sign that Congress wanted an administrative agency—be it Energy or FERC—second-guessing that legislative judgment. In fact, not all LNG Terminals fall under FERC's jurisdiction. The construction of offshore LNG Terminals in federal waters is regulated by the Maritime Administration or, less commonly, the Bureau of Ocean Energy Management. DOE0001 at 78199 n.21. If consideration of LNG Terminals and LNG exports can be bifurcated in those cases, there is no reason both must fall under a single agency when the terminal is onshore or in state waters.

Second, the NGA does not require Energy to weigh all environmental effects—be they direct or indirect—in its public interest analysis, and Energy has determined that its public interest analysis is properly focused on domestic natural gas supplies. Thus, even if Energy had regulatory authority

over LNG Terminals, it would not balance any adverse environmental effects from terminal construction against the benefits of exports. Nor would the exclusion of terminal effects from the public interest analysis be "lopsided," as Sierra Club suggests. Br. 43. The focus of the public interest analysis is on the economic and energy security effects of exports. Energy may therefore reasonably consider the economic effects of terminal construction and operation without also considering the environmental effects. Above, pp. 28-29.

Finally, inclusion of terminal effects in Energy's NEPA analysis would be both duplicative and pointless. FERC prepares an environmental impact statement that fully analyzes the environmental effects of terminal construction and operation when it considers an application to build a new terminal, *e.g.*, CP20263, and FERC's orders authorizing terminal construction typically include conditions meant to address adverse environmental effects, *e.g.*, CP20247 at 90-91. There is nothing that Energy's further consideration of terminal effects could add to that analysis. Nor is consideration of terminal effects necessary for Energy's NEPA analysis of export authorization orders. As Energy explained in the Exclusion Rule, the NEPA analysis of export orders is properly limited to the reasonably foreseeable effects of the transportation of LNG by marine vessel. DOE0001 at 78197. Terminal effects are not relevant to that inquiry. Consideration of terminal effects in Energy's NEPA

analysis for export authorizations would therefore "serve no purpose." *Pub. Citizen*, 541 U.S. at 767 (quotation omitted).

## IV. If Energy erred in its environmental analysis, vacatur would not be appropriate.

### A. There is no reason to believe Energy would deny CP2 LNG's application if it undertook additional environmental analysis.

"The ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained." *Seven Cnty.*, 605 U.S. at 184-85. Thus, "[e]ven if an EIS falls short in some respects" vacatur is generally not appropriate "absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Id.* at 185.

Energy explained in the Rehearing Order that it would still conclude that the Authorization Order is in the public interest even if it were required to consider all the environmental effects Sierra Club asserts. CP20051 at 33. In reaching that alternative conclusion, Energy considered the Technical Support Document, as well as a range of other sources, including the studies Sierra Club relies on to show that upstream and downstream greenhouse gas emissions are foreseeable. *Id.*; *see also* Br. at 48 (citing DOE0053 and DOE0046). Accordingly, there is "no reason to believe" Energy would have denied CP2 LNG's application if it had "added more" to its NEPA review.

*Seven Cnty.*, 605 U.S. at 185. Sierra Club's assertion that Energy's statement is "insufficient" gets the analysis backwards. It is Sierra Club's burden to show that there is some reason to believe that Energy would have reached a different conclusion had it undertaken a broader analysis. *Id.*; *see also El Puente*, 100 F.4th at 246. Sierra Club has not even attempted to meet that burden. That alone is sufficient reason to deny vacatur.

In any event, there is good reason to believe that Energy would have granted the requested authorization even if it had considered upstream and downstream environmental effects. Energy has considered dozens of applications for authority to export LNG to non-FTA countries. In many of those proceedings, Energy considered environmental effects as part of its public interest analysis, e.g., CP20083, yet Energy has never denied authorization to export to non-FTA counties on the basis of environmental concerns. As Energy explained in 2014:

> Section 3(a) of the NGA is too blunt an instrument to address these environmental concerns efficiently. A decision to prohibit exports of natural gas would cause the United States to forego entirely the economic and international benefits [of LNG exports], but would have little more than a modest, incremental effect on the environmental issues identified by Sierra Club."

CP20083 at 76. This Court upheld that reasoning in *Freeport II*, 867 F.3d at 203, and there is no reason to believe Energy would not reach the same conclusion today.

### B. Vacatur of the Authorization Order would not be appropriate because it would be highly disruptive.

Even if the Court were to find some error in the Authorization Order that is not harmless, vacatur would not be appropriate. "The decision whether to vacate depends on the seriousness of the order's deficiencies … and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (quotation omitted).

As explained above, the shortcomings Sierra Club asserts are not serious. Environmental considerations are at most subsidiary purposes of the NGA, and even when it has weighed environmental concerns, Energy has consistently found that they do not overcome the statutory presumption that natural gas exports are in the public interest. If there were any error on Energy's part, it would at most be a lack of adequate explanation, which is the kind of error that warrants only remand without vacatur. *See, e.g.*, *City of Oberlin*, 937 F.3d at 611.

Vacatur of the Authorization Order would also be highly disruptive. Construction of CP2 LNG's terminal is well underway, and exports are expected to start next year. *Venture Global Reports Second Quarter 2026 Results* 3 (Aug. 11, 2026) *available at* https://perma.cc/9U66-Q549. If the Authorization Order were vacated, there would be a risk that Energy could not

issue a new order in time for those exports to occur, which could result in financial harm to CP2 LNG. Vacatur could also prevent LNG exports that Energy has found to be in the public interest, in part, for reasons of energy security. CP20048 at 52-53. Given that the errors Sierra Club asserts are minor, it would be inequitable to place those risks on CP2 LNG and the public interest by vacating the Authorization Order. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,* 513 U.S. 18, 26 (1994) ("[W]hen federal courts contemplate equitable relief" like vacatur, they "must also take account of the public interest").

### C. If the Court finds errors in the Exclusion Rule, vacatur would be unnecessary.

If the Court were to find errors in the Exclusion Rule, the proper remedy for the rule would be remand without vacatur. First, it is likely that Energy could address any errors on remand through further explanation. Second, vacatur of the Exclusion Rule would be unnecessary. The Rule is a procedural rule that governs the manner in which Energy conducts its NEPA analysis of applications for authorization to export LNG. Thus, it has effect only when applied in authorization proceedings. If the Court finds the Rule to be flawed, Energy could not rely on the Rule until it addressed those flaws without putting at risk the orders in which it is applied. Accordingly, Energy would be unlikely to apply the Exclusion Rule until it had addressed the

Court's concerns. Vacatur would therefore not benefit Sierra Club; it would only create additional procedural work for Energy by restarting the rulemaking process from scratch.

Even if the Court were to determine that vacatur of the categorical exclusion is appropriate, it should not vacate the Exclusion Rule in its entirety. Besides promulgating the categorical exclusion for LNG exports by marine vessel, the Rule deleted requirements that Energy ordinarily prepare an environmental assessment or environmental impact statement for certain actions. Sierra Club has not argued that deletion of those requirements was unlawful, and nothing in NEPA requires agencies to maintain such regulations. There is therefore no legal basis for vacating those portions of the Exclusion Rule.

## CONCLUSION

For the foregoing reasons, the petitions for review should be denied.

Respectfully submitted,

s/ *Christopher Anderson*

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT J. LUNDMAN
CHRISTOPHER ANDERSON
*Attorneys*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-1971
christopher.anderson3@usdoj.gov

Of counsel:

BETTINA MUMME
*Attorney*
Office of General Counsel
U.S. Department of Energy

August 13, 2026
90-13-5-18116

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,964 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Georgia font.

s/ *Christopher Anderson*
CHRISTOPHER ANDERSON
Counsel for Federal Respondents

## STATUTORY ADDENDUM

Natural Gas Act, sec. 3, 15 U.S.C. § 717b .......................................................1a

Energy Policy Act of 2005, sec. 311,
Pub. L. 109-58, 119 Stat. 594, 685-688 (2005) .......................................... 5a

**15 U.S. Code § 717b**
**Exportation or importation of natural gas; LNG terminals**

(a) Mandatory authorization order

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

(b) Free trade agreements

> With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas—
>
> (1) the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and
>
> (2) the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

(c) Expedited application and approval process

For purposes of subsection (a), the importation of the natural gas referred to in subsection (b), or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public

interest, and applications for such importation or exportation shall be granted without modification or delay.

(d) Construction with other laws

Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under—

(1) the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

(2) the Clean Air Act (42 U.S.C. 7401 et seq.); or

(3) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

(e) LNG terminals

(1) The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

(2) Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall—

(A) set the matter for hearing;

(B) give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 717b–1 of this title;

(C) decide the matter in accordance with this subsection; and

(D) issue or deny the appropriate order accordingly.

(3) (A) Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find [1] necessary or appropriate.

(B) Before January 1, 2015, the Commission shall not—

(i) deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

(ii) condition an order on—

(I) a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

(II) any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

(III) a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

(C) Subparagraph (B) shall cease to have effect on January 1, 2030.

(4) An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

(f) Military installations

(1) In this subsection, the term “military installation”—

(A) means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

(B) does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

(2) The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult [2] with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

(3) The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

Public Law 109–58
109th Congress

# An Act

Aug. 8, 2005
[H.R. 6]

To ensure jobs for our future with secure, affordable, and reliable energy.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*,

Energy Policy Act of 2005.
42 USC 15801 note.

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Energy Policy Act of 2005".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.

TITLE I—ENERGY EFFICIENCY

Subtitle A—Federal Programs

Sec. 101. Energy and water saving measures in congressional buildings.
Sec. 102. Energy management requirements.
Sec. 103. Energy use measurement and accountability.
Sec. 104. Procurement of energy efficient products.
Sec. 105. Energy savings performance contracts.
Sec. 106. Voluntary commitments to reduce industrial energy intensity.
Sec. 107. Advanced Building Efficiency Testbed.
Sec. 108. Increased use of recovered mineral component in federally funded projects involving procurement of cement or concrete.
Sec. 109. Federal building performance standards.
Sec. 110. Daylight savings.
Sec. 111. Enhancing energy efficiency in management of Federal lands.

Subtitle B—Energy Assistance and State Programs

Sec. 121. Low-income home energy assistance program.
Sec. 122. Weatherization assistance.
Sec. 123. State energy programs.
Sec. 124. Energy efficient appliance rebate programs.
Sec. 125. Energy efficient public buildings.
Sec. 126. Low income community energy efficiency pilot program.
Sec. 127. State Technologies Advancement Collaborative.
Sec. 128. State building energy efficiency codes incentives.

Subtitle C—Energy Efficient Products

Sec. 131. Energy Star program.
Sec. 132. HVAC maintenance consumer education program.
Sec. 133. Public energy education program.
Sec. 134. Energy efficiency public information initiative.
Sec. 135. Energy conservation standards for additional products.
Sec. 136. Energy conservation standards for commercial equipment.
Sec. 137. Energy labeling.
Sec. 138. Intermittent escalator study.
Sec. 139. Energy efficient electric and natural gas utilities study.
Sec. 140. Energy efficiency pilot program.
Sec. 141. Report on failure to comply with deadlines for new or revised energy conservation standards.

Subtitle D—Public Housing

Sec. 151. Public housing capital fund.

Sec. 152. Energy-efficient appliances.
Sec. 153. Energy efficiency standards.
Sec. 154. Energy strategy for HUD.

TITLE II—RENEWABLE ENERGY

Subtitle A—General Provisions

Sec. 201. Assessment of renewable energy resources.
Sec. 202. Renewable energy production incentive.
Sec. 203. Federal purchase requirement.
Sec. 204. Use of photovoltaic energy in public buildings.
Sec. 205. Biobased products.
Sec. 206. Renewable energy security.
Sec. 207. Installation of photovoltaic system.
Sec. 208. Sugar cane ethanol program.
Sec. 209. Rural and remote community electrification grants.
Sec. 210. Grants to improve the commercial value of forest biomass for electric energy, useful heat, transportation fuels, and other commercial purposes.
Sec. 211. Sense of Congress regarding generation capacity of electricity from renewable energy resources on public lands.

Subtitle B—Geothermal Energy

Sec. 221. Short title.
Sec. 222. Competitive lease sale requirements.
Sec. 223. Direct use.
Sec. 224. Royalties and near-term production incentives.
Sec. 225. Coordination of geothermal leasing and permitting on Federal lands.
Sec. 226. Assessment of geothermal energy potential.
Sec. 227. Cooperative or unit plans.
Sec. 228. Royalty on byproducts.
Sec. 229. Authorities of Secretary to readjust terms, conditions, rentals, and royalties.
Sec. 230. Crediting of rental toward royalty.
Sec. 231. Lease duration and work commitment requirements.
Sec. 232. Advanced royalties required for cessation of production.
Sec. 233. Annual rental.
Sec. 234. Deposit and use of geothermal lease revenues for 5 fiscal years.
Sec. 235. Acreage limitations.
Sec. 236. Technical amendments.
Sec. 237. Intermountain West Geothermal Consortium.

Subtitle C—Hydroelectric

Sec. 241. Alternative conditions and fishways.
Sec. 242. Hydroelectric production incentives.
Sec. 243. Hydroelectric efficiency improvement.
Sec. 244. Alaska State jurisdiction over small hydroelectric projects.
Sec. 245. Flint Creek hydroelectric project.
Sec. 246. Small hydroelectric power projects.

Subtitle D—Insular Energy

Sec. 251. Insular areas energy security.
Sec. 252. Projects enhancing insular energy independence.

TITLE III—OIL AND GAS

Subtitle A—Petroleum Reserve and Home Heating Oil

Sec. 301. Permanent authority to operate the Strategic Petroleum Reserve and other energy programs.
Sec. 302. National Oilheat Research Alliance.
Sec. 303. Site selection.

Subtitle B—Natural Gas

Sec. 311. Exportation or importation of natural gas.
Sec. 312. New natural gas storage facilities.
Sec. 313. Process coordination; hearings; rules of procedure.
Sec. 314. Penalties.
Sec. 315. Market manipulation.
Sec. 316. Natural gas market transparency rules.
Sec. 317. Federal-State liquefied natural gas forums.
Sec. 318. Prohibition of trading and serving by certain individuals.

Subtitle C—Production

Sec. 321. Outer Continental Shelf provisions.

for the review of requests for the deferrals of scheduled deliveries.

(C) DEADLINES.—The Secretary shall—

(i) propose the procedures required under the amendment made by subparagraph (A) not later than 120 days after the date of enactment of this Act;

(ii) promulgate the procedures not later than 180 days after the date of enactment of this Act; and

(iii) comply with the procedures in acquiring petroleum for the Reserve effective beginning on the date that is 180 days after the date of enactment of this Act.

**SEC. 302. NATIONAL OILHEAT RESEARCH ALLIANCE.**

Section 713 of the Energy Act of 2000 (Public Law 106–469; 42 U.S.C. 6201 note) is amended by striking "4" and inserting "9".

**SEC. 303. SITE SELECTION.** Deadline.

Not later than 1 year after the date of enactment of this Act, the Secretary shall complete a proceeding to select, from sites that the Secretary has previously studied, sites necessary to enable acquisition by the Secretary of the full authorized volume of the Strategic Petroleum Reserve. In such proceeding, the Secretary shall first consider and give preference to the five sites which the Secretary previously assessed in the Draft Environmental Impact Statement, DOE/EIS–0165–D. However, the Secretary in his discretion may select other sites as proposed by a State where a site has been previously studied by the Secretary to meet the full authorized volume of the Strategic Petroleum Reserve.

## Subtitle B—Natural Gas

**SEC. 311. EXPORTATION OR IMPORTATION OF NATURAL GAS.**

(a) SCOPE OF NATURAL GAS ACT.—Section 1(b) of the Natural Gas Act (15 U.S.C. 717(b)) is amended by inserting "and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation," after "such transportation or sale,".

(b) DEFINITION.—Section 2 of the Natural Gas Act (15 U.S.C. 717a) is amended by adding at the end the following new paragraph:

"(11) 'LNG terminal' includes all natural gas facilities located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is imported to the United States from a foreign country, exported to a foreign country from the United States, or transported in interstate commerce by waterborne vessel, but does not include—

"(A) waterborne vessels used to deliver natural gas to or from any such facility; or

"(B) any pipeline or storage facility subject to the jurisdiction of the Commission under section 7.".

(c) AUTHORIZATION FOR SITING, CONSTRUCTION, EXPANSION, OR OPERATION OF LNG TERMINALS.—(1) The title for section 3 of the Natural Gas Act (15 U.S.C. 717b) is amended by inserting "; LNG TERMINALS" after "EXPORTATION OR IMPORTATION OF NATURAL GAS".

(2) Section 3 of the Natural Gas Act (15 U.S.C. 717b) is amended by adding at the end the following:

"(d) Except as specifically provided in this Act, nothing in this Act affects the rights of States under—

"(1) the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

"(2) the Clean Air Act (42 U.S.C. 7401 et seq.); or

"(3) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

"(e)(1) The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this Act, nothing in this Act is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

"(2) Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall—

"(A) set the matter for hearing;

Notice.

"(B) give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 3A;

"(C) decide the matter in accordance with this subsection; and

"(D) issue or deny the appropriate order accordingly.

"(3)(A) Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find necessary or appropriate.

"(B) Before January 1, 2015, the Commission shall not—

"(i) deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

"(ii) condition an order on—

"(I) a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

"(II) any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

"(III) a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

Termination date.

"(C) Subparagraph (B) shall cease to have effect on January 1, 2030.

"(4) An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

"(f)(1) In this subsection, the term 'military installation'—

"(A) means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

"(B) does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

"(2) The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation. Memorandum.

"(3) The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.".

(d) LNG TERMINAL STATE AND LOCAL SAFETY CONCERNS.—After section 3 of the Natural Gas Act (15 U.S.C. 717b) insert the following:

"STATE AND LOCAL SAFETY CONSIDERATIONS

"SEC. 3A. (a) The Commission shall promulgate regulations on the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) pre-filing process within 60 days after the date of enactment of this section. An applicant shall comply with pre-filing process required under the National Environmental Policy Act of 1969 prior to filing an application with the Commission. The regulations shall require that the pre-filing process commence at least 6 months prior to the filing of an application for authorization to construct an LNG terminal and encourage applicants to cooperate with State and local officials. Regulations. Deadline. 15 USC 717b–1.

"(b) The Governor of a State in which an LNG terminal is proposed to be located shall designate the appropriate State agency for the purposes of consulting with the Commission regarding an application under section 3. The Commission shall consult with such State agency regarding State and local safety considerations prior to issuing an order pursuant to section 3. For the purposes of this section, State and local safety considerations include—

"(1) the kind and use of the facility;

"(2) the existing and projected population and demographic characteristics of the location;

"(3) the existing and proposed land use near the location;

"(4) the natural and physical aspects of the location;

"(5) the emergency response capabilities near the facility location; and

"(6) the need to encourage remote siting.

"(c) The State agency may furnish an advisory report on State and local safety considerations to the Commission with respect to an application no later than 30 days after the application was filed with the Commission. Before issuing an order authorizing an applicant to site, construct, expand, or operate an LNG terminal, the Commission shall review and respond specifically to the issues raised by the State agency described in subsection (b) in the advisory report. This subsection shall apply to any application filed after the date of enactment of the Energy Policy Act of 2005. A State agency has 30 days after such date of enactment to file an advisory report related to any applications pending at the Commission as of such date of enactment. Applicability. Deadline. Reports.

"(d) The State commission of the State in which an LNG terminal is located may, after the terminal is operational, conduct

safety inspections in conformance with Federal regulations and guidelines with respect to the LNG terminal upon written notice to the Commission. The State commission may notify the Commission of any alleged safety violations. The Commission shall transmit information regarding such allegations to the appropriate Federal agency, which shall take appropriate action and notify the State commission.

Notification.

"(e)(1) In any order authorizing an LNG terminal the Commission shall require the LNG terminal operator to develop an Emergency Response Plan. The Emergency Response Plan shall be prepared in consultation with the United States Coast Guard and State and local agencies and be approved by the Commission prior to any final approval to begin construction. The Plan shall include a cost-sharing plan.

"(2) A cost-sharing plan developed under paragraph (1) shall include a description of any direct cost reimbursements that the applicant agrees to provide to any State and local agencies with responsibility for security and safety—

"(A) at the LNG terminal; and

"(B) in proximity to vessels that serve the facility.".

**SEC. 312. NEW NATURAL GAS STORAGE FACILITIES.**

Section 4 of the Natural Gas Act (15 U.S.C. 717c) is amended by adding at the end the following:

"(f)(1) In exercising its authority under this Act or the Natural Gas Policy Act of 1978 (15 U.S.C. 3301 et seq.), the Commission may authorize a natural gas company (or any person that will be a natural gas company on completion of any proposed construction) to provide storage and storage-related services at market-based rates for new storage capacity related to a specific facility placed in service after the date of enactment of the Energy Policy Act of 2005, notwithstanding the fact that the company is unable to demonstrate that the company lacks market power, if the Commission determines that—

"(A) market-based rates are in the public interest and necessary to encourage the construction of the storage capacity in the area needing storage services; and

"(B) customers are adequately protected.

"(2) The Commission shall ensure that reasonable terms and conditions are in place to protect consumers.

"(3) If the Commission authorizes a natural gas company to charge market-based rates under this subsection, the Commission shall review periodically whether the market-based rate is just, reasonable, and not unduly discriminatory or preferential.".

**SEC. 313. PROCESS COORDINATION; HEARINGS; RULES OF PROCEDURE.**

(a) IN GENERAL.—Section 15 of the Natural Gas Act (15 U.S.C. 717n) is amended—

(1) by striking the section heading and inserting "PROCESS COORDINATION; HEARINGS; RULES OF PROCEDURE";

(2) by redesignating subsections (a) and (b) as subsections (e) and (f), respectively; and

(3) by striking "SEC. 15." and inserting the following:

"SEC. 15.(a) In this section, the term 'Federal authorization'—

"(1) means any authorization required under Federal law with respect to an application for authorization under section