ORAL ARGUMENT NOT YET SCHEDULED

**No. 26-1036**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

SIERRA CLUB and NATURAL RESOURCES DEFENSE COUNCIL,

*Petitioners*,

v.

CHRIS WRIGHT, in his official capacity as Secretary of Energy, United States Department of Energy, and UNITED STATES DEPARTMENT OF ENERGY,

*Respondents*.

On Petition for Review of Orders of the U.S. Department of Energy

# PETITIONERS' JOINT REPLY BRIEF

Nathan Matthews
Earthjustice
180 Steuart St., #194330
San Francisco, CA 94105
415.217.2183
nmatthews@earthjustice.org

Alexandra M. Smith
Earthjustice
1250 I Street NW, 4th Floor
Washington, DC 20005
202.798.5384
lsmith@earthjustice.org

Ann Jaworski
Earthjustice
311 S. Wacker Drive, Suite 1400
Chicago, IL 60606
773.245.0837
ajaworski@earthjustice.org

*Counsel for Petitioner Sierra Club*

Additional counsel on next page

Adeline S. Rolnick
Gillian R. Giannetti
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
202.513.6240
arolnick@nrdc.org
ggiannetti@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

# TABLE OF CONTENTS


Table of Contents ........ i

Table of Authorities ........ iii

Glossary ........ vii

Summary of Argument ........ 1

Argument ........ 4

I. Petitioners' Challenge to the Exclusion Rule Is Properly Before This Court ........ 4

II. DOE's Conclusion That It Lacked Authority to Consider Terminal Impacts Rests on Misinterpretation of the NGA and Does Not Justify Excluding Terminal Impacts from NEPA Review. ........ 7

A. Context and Legislative History Cannot Override the NGA's Clear Statutory Text. ........ 7

B. DOE's Legal Error Is Fatal, and DOE's Alternative Arguments Also Fail. ........ 11

III. Upstream and Downstream Greenhouse Gas Emissions Are Relevant to DOE's Decisionmaking and Foreseeable. ........ 14

A. The NGA Requires DOE to Consider Environmental Effects, Including Foreseeable Effects of Changes in Gas Production and Use. ........ 15

B. Because DOE Relied on Upstream and Downstream Activities to Justify Section 3 Authorization, NEPA Required DOE to Consider Foreseeable Environmental Impacts of Those Activities ........ 18

C. DOE's Conclusion That Upstream and Downstream Greenhouse Gas Emissions Were Unforeseeable Was Arbitrary ........ 23

1. DOE Misstates the Exclusion Rule's Rationale. ........ 24

2. DOE's Own Studies Refute DOE's Conclusion That Upstream Greenhouse Gas Emissions Were Unforeseeable. ........ 25

3. The Exclusion Rule's Conclusion That Downstream Emissions Would Never Be Foreseeable Was Arbitrary at the Time and Did Not Justify Ignoring Future Analysis. ........ 28

IV. DOE's Conclusion That Ship Traffic Will Have Insignificant Impacts Was Arbitrary. ........ 29

V. Remedy ........ 34

Conclusion ........ 35

Certificate of Compliance ........ 37

Supplement to Statutory Addendum ........ 38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. NRC*,
988 F.2d 146 (D.C. Cir. 1993) ........ 34

*Am. Bankers Ass'n v. SEC*,
804 F.2d 739 (D.C. Cir. 1986) ........ 8

* *Bohon v. FERC*,
37 F.4th 663 (D.C. Cir. 2022) ........ 5, 6

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ........ 10

*BP p.l.c. v. Mayor & City Council of Baltimore*,
593 U.S. 230 (2021) ........ 10

*Calcutt v. Fed. Deposit Ins. Corp.*,
598 U.S. 623 (2023) ........ 11

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) ........ 17

*Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*,
971 F.3d 340 (D.C. Cir. 2020) ........ 6

*City of Port Isabel v. FERC*,
111 F.4th 1198 (D.C. Cir. 2024) ........ 13

* *City of Tacoma v. Taxpayers of Tacoma*,
357 U.S. 320 (1958) ........ 1, 5

*City of Tacoma, Washington v. FERC*,
460 F.3d 53 (D.C. Cir. 2006) ........ 5

*Authorities principally relied on are marked with **

*Ctr. for Biological Diversity v. FERC*,
67 F.4th 1176 (D.C. Cir. 2023) .......... 27

*Ctr. for Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026) .......... 34

*Del. Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014) .......... 25, 27

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024) .......... 8, 9

* *Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) .......... 18, 20

*Food & Water Watch v. FERC*,
28 F.4th 277 (D.C. Cir. 2022) .......... 28

*Food Marketing Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) .......... 10

*For a Better Bayou v. FERC*,
188 F.4th 516 (D.C. Cir. 2026) .......... 9, 16

*Healthy Gulf v. FERC*,
107 F.4th 1033 (D.C. Cir. 2024) .......... 16

*Hubbard v. United States*,
514 U.S. 695 (1995) .......... 8

*Kimel v. Fla. Bd. of Regents*,
528 U.S. 62 (2000) .......... 10

*Meredith Corp. v. FCC*,
809 F.2d 863 (D.C. Cir. 1987) .......... 29

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) .......... 34

*N.J. Conservation Found. v. FERC*,
111 F.4th 42 (D.C. Cir. 2024) .......... 17

*NAACP v. Federal Power Commission*,
425 U.S. 662 (1976) .......... 15

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) .......... 21

*NLRB Union v. FLRA*,
834 F.2d 191 (D.C. Cir. 1987) .......... 6

*NRDC v. NRC*,
823 F.3d 641 (D.C. Cir. 2016) .......... 5

*PPG Indus., Inc. v. United States*,
52 F.3d 363 (D.C. Cir. 1995) .......... 11

*Rowland v. California Men's Colony, Unit II Men's Advisory Council*,
506 U.S. 194 (1993) .......... 8

* *Seven County Infrastructure Coalition v. Eagle County*,
605 U.S. 168 (2025) .......... 3, 11, 12, 18, 19, 20, 21, 28, 31, 34

*Sierra Club v. DOE*,
134 F.4th 568 (D.C. Cir. 2025) .......... 28

*Sierra Club v. DOE, ("Freeport II")*
867 F.3d 189 (D.C. Cir. 2017) .......... 15, 26

*Sierra Club v. FERC*, ("*Cumberland*")
153 F.4th 1295 (D.C. Cir. 2025) .......... 16, 17, 22

*Sierra Club v. FERC*, ("*Sabal Trail*")
867 F.3d 1357 (D.C. Cir. 2017) .......... 17, 22

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011) .......... 20

*Sw. Elec. Power Co. v. EPA*,
920 F.3d 999 (5th Cir. 2019) .......... 33

*Thaler v. Perlmutter*,
130 F.4th 1039 (D.C. Cir. 2025) .......... 13, 14

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
6 F.4th 1321 (D.C. Cir. 2021) ........................................................ 16

*Viasat, Inc. v. FCC*,
47 F.4th 769 (D.C. Cir. 2022) ........................................................ 4

*W. Va. Pub. Servs. Comm'n v. DOE*,
681 F.2d 847 (D.C. Cir. 1982) ........................................................ 16

**Statutes**

15 U.S.C. § 717a........................................................................ 7, 8

* 15 U.S.C. § 717b.............................................................. 1, 7, 8, 11, 13

15 U.S.C. § 717n ........................................................................ 7, 9

42 U.S.C. § 4332........................................................................ 25

42 U.S.C. § 7151........................................................................ 9

42 U.S.C. § 7172........................................................................ 9

49 U.S.C. § 10101...................................................................... 19

**Other Authorities**

169 Cong. Rec. H2681-04 (May 31, 2023)............................................ 26

*Alaska LNG Project*,
Docket No. 14-96-LNG, Order No. 3643-C (Apr. 13, 2023)................ 17

Endangered Status of the Gulf of Mexico Bryde's Whale,
84 Fed. Reg. 15446 (Apr. 15, 2019) .................................................. 32

## GLOSSARY

| | |
|---|---|
| CP2____ | Item from the administrative record for the Authorization Order, Venture Global CP2 LNG, LLC, DOE/FE Docket No. 21-131-LNG |
| DOE | U.S. Department of Energy |
| DOE____ | Item from the administrative record for the Exclusion Rule, National Environmental Policy Act Implementing Procedures, 85 Fed. Reg. 78,197, Docket No. DOE-HQ-2020-0017 |
| FERC | Federal Energy Regulatory Commission |
| FTA | Free Trade Agreement |
| LNG | Liquefied Natural Gas |
| NEPA | National Environmental Policy Act |
| NGA | Natural Gas Act |

## SUMMARY OF ARGUMENT

Petitioners' challenge to the Exclusion Rule, DOE0001 [JA001–009], is properly before this Court. Cases limiting parties' ability to challenge rules in later adjudications do not apply here, because Petitioners also challenge the Rule directly. The challenge to the Authorization Order, CP20048 [JA193–265], is properly before this Court, and the Exclusion Rule challenge will require deciding issues that inhere in the Authorization Order challenge. *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958), therefore vests this Court with jurisdiction over the rule challenge.

The Department of Energy's ("DOE") conclusion that the environmental impacts of liquefied natural gas ("LNG") terminals are outside the scope of DOE's National Environmental Policy Act ("NEPA") review rests on a flawed interpretation of Natural Gas Act ("NGA") Section 3(e), 15 U.S.C. § 717b(e). The NGA explicitly defines "Commission" to mean "Federal Power Commission," whose Section 3 authority has been transferred to DOE. This case does not present the extraordinary circumstances needed to justify departure from explicit statutory text, as evidenced by, *inter alia*, the fact that this Court has

consistently adopted Petitioners' interpretation of the statute. While DOE's misinterpretation of its statutory authority itself requires remand, Respondents' alternative arguments are also meritless.

DOE's conclusion that it can ignore greenhouse gas emissions from upstream gas drilling and downstream use of LNG (together, lifecycle effects) is arbitrary. Courts have consistently held that NGA Section 3 requires considering environmental effects, invalidating DOE's argument that it can ignore lifecycle effects because it can ignore environmental effects altogether. NEPA also requires considering lifecycle effects here. DOE's export authorization is more than a "but for" cause of additional gas drilling. Section 3, unlike other statutes, is centrally concerned with effects it does not directly regulate, including "the domestic need for the natural gas proposed to be exported" and exports' impact on "domestic natural gas supplies." DOE Br. 8, 23. DOE "considered how the production of natural gas would change in response to additional exports because that effect is germane" to these issues, *id.* at 28, and concluded that price and supply impacts would be acceptable *because* exports would cause additional gas production. Opening Br. 15–16. DOE's reliance on increased drilling makes its environmental effects

relevant to DOE's decisionmaking despite DOE's lack of regulatory authority over drilling and distinguishes this case from *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025). DOE was required to consider downstream impacts for similar reasons.

DOE separately erred in dismissing upstream and downstream greenhouse gas emissions as unforeseeable. DOE's own robust studies predating the Exclusion Rule and the Authorization Order already estimated upstream greenhouse gas emissions. DOE states that these forecasts are assumption-dependent but does not argue that any of the assumptions, inputs, or methods are unreasonable. DOE's refusal to consider its own studies violated NEPA's requirement for reasonable forecasting. For downstream effects, even if DOE had not yet foreseen them when it promulgated the Exclusion Rule, it was arbitrary for DOE to categorically determine that they would never be foreseeable. Indeed, DOE's 2024 Study of export impacts, CP20253 [JA521–557], foresaw downstream impacts. The Authorization Order's decision to disregard that study was arbitrary.

DOE's conclusion that LNG vessel traffic would have insignificant effects was arbitrary as well. DOE claimed that past LNG ship traffic

was too small a share of total U.S. shipping to matter, so it was not worth the resources to model future export volumes and associated traffic levels. Among other things, this conclusion ignored the fact that DOE had already done such modeling, which predicted exports would increase five- to ten-fold.

Finally, vacatur is the appropriate remedy.

## ARGUMENT

### I. PETITIONERS' CHALLENGE TO THE EXCLUSION RULE IS PROPERLY BEFORE THIS COURT.

DOE agrees that this Court has jurisdiction over Petitioners' challenges to both the Exclusion Rule and Authorization Order. DOE Br. 5.

Intervenor errs in arguing that Petitioners "are smuggling a challenge to the Exclusion Rule" into their challenge to the Authorization Order and that this Court is limited to reviewing DOE's determination whether extraordinary circumstances precluded applying the Exclusion Rule here. Int. Br. 14–15.

The petition here seeks review of both the Authorization Order and the Exclusion Rule. This distinguishes *Viasat, Inc. v. FCC*, 47 F.4th

769, 776 (D.C. Cir. 2022), and *NRDC v. NRC*, 823 F.3d 641, 654 (D.C. Cir. 2016), in which petitioners did not ask this Court for direct review of the underlying rule. Those cases' holdings about what arguments agencies may reject in adjudications have no bearing on Petitioners' ability to bring a direct challenge to a rule.

Intervenor argues that Petitioners must directly challenge the Exclusion Rule in district court. Int. Br. 14, 16. This Court's cases applying *City of Tacoma*, 357 U.S. at 336, hold otherwise. Opening Br. 6 (citing, *e.g., Bohon v. FERC*, 37 F.4th 663, 665 (D.C. Cir. 2022), *vacated*, 143 S. Ct. 1779 (2023), *judgment reinstated*, 92 F.4th 1121 (D.C. Cir. 2024)).

Under *City of Tacoma*, this Court's jurisdiction encompasses the Exclusion Rule challenge because it requires deciding issues also "inhering in" the Authorization Order challenge, 357 U.S. at 336, even if such a rule could be reviewed elsewhere "in other contexts." *City of Tacoma, Washington v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006). Claims (like the Exclusion Rule challenge) that, if successful, would invalidate

an NGA decision under the Circuit courts' exclusive[1] jurisdiction (like the Authorization Order here) "fall squarely within the [NGA]'s review scheme" and must be brought here. *Bohon*, 37 F.4th at 666. Even absent a separate challenge to the Exclusion Rule, the challenge to the Authorization Order, which applied the Rule, permits this Court to review arguments that the Rule "conflicts with" NEPA and the NGA. *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 971 F.3d 340, 348 (D.C. Cir. 2020) (citation modified) (applying *NLRB Union v. FLRA*, 834 F.2d 191, 195 (D.C. Cir. 1987)).

Because Petitioners challenge the validity of the Rule itself, cases laying out the standard of review for claims that an agency improperly applied a categorical exclusion that was not itself challenged, Int. Br. 15, have no bearing on this Court's jurisdiction or scope of review.

---

[1] Petitioners' intention to file a protective complaint in district court, Opening Br. 6 n.1, is not a concession that this Court's jurisdiction is not exclusive, *contra* Int. Br. 16.

## II. DOE'S CONCLUSION THAT IT LACKED AUTHORITY TO CONSIDER TERMINAL IMPACTS RESTS ON MISINTERPRETATION OF THE NGA AND DOES NOT JUSTIFY EXCLUDING TERMINAL IMPACTS FROM NEPA REVIEW.

DOE's argument that it lacks authority over terminals and therefore has no NEPA obligation to consider terminal impacts misreads the NGA's text, which, together with DOE's organic statute, explicitly vests DOE with that authority. Because the statutory text is clear, legislative history is irrelevant. This Court's analysis can, and should, end there: where an agency bases a decision on statutory misinterpretation, courts should remand for reconsideration under a correct understanding of the statute. Furthermore, DOE's alternative arguments are post hoc and meritless.

### A. Context and Legislative History Cannot Override the NGA's Clear Statutory Text.

The NGA explicitly defines "Commission" as the Federal Power Commission, 15 U.S.C. § 717a(9), whose NGA Section 3 powers were later transferred to DOE. Opening Br. 13, 34–35. Nothing in Section 3's text or the NGA's structure supports reading "Commission" in 15 U.S.C. § 717b(e) (or § 717n(b)(1), *contra* Amici Br. 7–8) to mean the Federal Energy Regulatory Commission ("FERC"). "When Congress takes the

trouble to define the terms it uses, a court must respect its definitions as virtually conclusive." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59–60 (2024) (quotation omitted). Because the statutory text is clear and does not lead to absurd results, arguments about context, ordinary meaning, and legislative history all fail.

DOE emphasizes that the NGA caveats its definitions, stating that they apply "unless the context otherwise requires," DOE Br. 46–47 (quoting 15 U.S.C. § 717a), but DOE ignores caselaw interpreting that caveat. "Context" in such a clause means surrounding statutory text, not legislative history or regulatory circumstances. *See Am. Bankers Ass'n v. SEC*, 804 F.2d 739, 753–54 (D.C. Cir. 1986); *accord Hubbard v. United States*, 514 U.S. 695, 702–04 (1995), *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199–200 (1993). Context "requires" a different definition only when applying the statutory definition leads to "absurd consequences" or interpretations "counter to the obvious thrust of the section." *Am. Bankers Ass'n*, 804 F.2d at 753. Here, nothing in the NGA's text "requires" interpreting "Commission" to mean FERC in 15 U.S.C. § 717b(e) (governing terminals) but the Federal Power Commission in § 717b(a) (governing

exports)—DOE's arguments solely refer to extra-textual factors. Courts consistently share Petitioners' reading of the statute, further demonstrating that this reading is not absurd. *See*, *e.g.*, *For a Better Bayou v. FERC*, 188 F.4th 516, 524 & n.1 (D.C. Cir. 2026); Opening Br. 34–35. Far from being "implausible," DOE Br. 19, it makes sense that Congress in 2005 continued to use "Commission" to refer to the Federal Power Commission and rely on existing reassignments, given that other statutes transfer some of the Federal Power Commission's powers to DOE, some to FERC, and some (*e.g.*, 15 U.S.C. § 717n) to both agencies concurrently. Opening Br. 12–13; 42 U.S.C. §§ 7151(a)–(b), 7172(a)(1), (a)(2)(B). Relying on existing statutory assignments makes more sense than leaving it to guesswork whether "Commission" means FERC or DOE from one paragraph to the next, as DOE suggests.

DOE's arguments about "ordinary meaning," DOE Br. 45, also fail. "[D]eviat[ing] from an express statutory definition merely because it varies from [the] term's ordinary meaning" is allowed only "when applying the definition would be incompatible with Congress['s] regulatory scheme or would destro[y] one of the statute's major purposes." *Kirtz*, 601 U.S. at 59–60 (quotation omitted). DOE has made

no such showing (nor could it) here, and its cited cases are inapposite. Neither *Bostock v. Clayton County*, 590 U.S. 644 (2020), nor *BP p.l.c. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 237 (2021), relied on the "ordinary meaning of [a statute's] terms at the time of their adoption," DOE Br. 46, to reject an explicit statutory definition.

While the Energy Policy Act of 2005, which amended the NGA, "does not define 'Commission,'" DOE Br. 45, that supports applying the definition Congress *did* provide in the NGA. The fact that interpreting the plain text requires reading both the NGA and DOE's organic statute does not mean that text is unclear; Congress can speak clearly without using "'a single section' adopted at a single moment in time," *see Kirtz*, 601 U.S. at 54 (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 76 (2000)), as it did by leaving the definition of "Commission" undisturbed in 2005.

Because the statutory text is clear, DOE's resort to legislative history is unavailing. Courts "never allow [legislative history] . . . to muddy the meaning of clear statutory language," *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) (quotation omitted). Moreover, the legislative history DOE cites, DOE Br. 45–48, merely

evinces intent to maintain the status quo as of 2005. That status quo was FERC's exercise of authority delegated by DOE, subject to DOE oversight and veto, rather than a regime in which DOE had no authority over export terminals. *See* Opening Br. 37.

**B. DOE's Legal Error Is Fatal, and DOE's Alternative Arguments Also Fail.**

"[W]hen a court . . . determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995); *see also Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 629 (2023) (per curiam). DOE made such an error by interpreting Section 3(e) to vest authority in FERC, not DOE. This Court should remand without considering DOE's post hoc arguments for affirming the Exclusion Rule despite DOE's misinterpretation of the NGA, DOE Br. 49–53, or Intervenor's arguments, Int. Br. 19–20. Alternatively, these arguments are meritless.

First, DOE errs in arguing that even if it had authority to consider the terminal, it could decline to do so because the terminal is a separate project. DOE Br. 49–53 (citing *Seven Cnty.*, 605 U.S. at 181, 183, 188).

*Seven County* permitted an agency to exclude effects from NEPA analysis where, *inter alia*, the agency "possesse[d] no regulatory authority" over them. 605 U.S. at 188. It did not suggest an agency can narrow its NEPA obligations by choosing not to "exercise" regulatory authority granted by Congress. DOE Br. 50 (quoting *Seven Cnty.*, 605 U.S. at 188). Moreover, *Seven County*'s examples of "separate projects" that agencies could decline to consider were other physical infrastructure built at separate times and places. 605 U.S. at 186–190. *Seven County* recognized agencies may be required to consider projects that were "interrelated and close in time and place," *id.* at 190. The terminal and export approvals are both for a single project and meet this standard.

DOE's related claim that the terminal and export approvals are not functionally interdependent is post-hoc. DOE Br. 51–52. The Exclusion Rule, at 78199 [JA003], concluded the two were not "connected actions" solely based on DOE's misreading of its statutory authority, and the Authorization and Rehearing Orders did not further discuss the issue. Insofar as they were required to do so, Petitioners exhausted their challenge to that conclusion. Rehearing Request,

CP20049 at 5, 31–33 [JA270, JA296–298]. DOE also misstates the legal standard: even if the terminal could proceed without non-Free Trade Agreement (non-"FTA") export authorization, the exports' dependence on the terminal renders the two connected. *City of Port Isabel v. FERC*, 111 F.4th 1198, 1212 (D.C. Cir. 2024), *on reh'g in part,* 130 F.4th 1034 (D.C. Cir. 2025). This post-hoc argument is also unsupported: nothing in the record suggests that this terminal *could* operate without non-FTA export authorization, Opening Br. 34 n.4, and Intervenor's arguments against vacatur indicate that it could not, Int. Br. 38.

Second, Intervenor's various arguments about DOE's authority to veto terminal approval are inapposite. Int. Br. 19–20. This case concerns not whether DOE failed to exercise that authority, but what DOE can consider when reviewing the export authorization. Opening Br. 38, 40–41. DOE's reservation of disapproval authority, both before and after enactment of Section 3(e), is relevant because it further rebuts DOE's claim that the NGA provides DOE no legal authority whatsoever to consider terminal impacts. Because the issue is DOE's export authorization decision, not the exercise of terminal disapproval authority, it does not matter whether declining to exercise disapproval

authority is itself a "major federal action" triggering NEPA, *contra* Int. Br. 19.

Finally, the fact that Congress did not provide DOE authority over offshore LNG export terminals, which are regulated under different statutes, DOE Br. 54 (citing Exclusion Rule at 78199 n.21 [JA003]), does not relieve DOE of the obligation to consider issues the NGA's text places within DOE's authority. The Court applies statutes as they are written. *Thaler v. Perlmutter*, 130 F.4th 1039, 1050–51 (D.C. Cir. 2025), *cert. denied*, 146 S. Ct. 1777 (2026). Authority to consider effects of onshore, but not offshore, terminals is not an absurdity that justifies departing from statutory text.

## III. UPSTREAM AND DOWNSTREAM GREENHOUSE GAS EMISSIONS ARE RELEVANT TO DOE'S DECISIONMAKING AND FORESEEABLE.

Caselaw refutes DOE's claim that it could ignore environmental impacts entirely under Section 3. Because the Authorization Order relied on increased production and foreign use of gas, DOE must examine the environmental impacts of those upstream and downstream effects in its Section 3 and NEPA analyses. DOE's existing analyses of

the climate impacts of exports refute DOE's claim that such impacts are categorically unforeseeable.

### A. The NGA Requires DOE to Consider Environmental Effects, Including Foreseeable Effects of Changes in Gas Production and Use.

In response to Petitioners' argument that Section 3 requires DOE to consider the environmental impacts of additional gas production and use caused by exports, Opening Br. 54–57, DOE argues that it can ignore these impacts because Section 3 permits it to ignore environmental impacts entirely. DOE Br. 23–27. DOE's claim is unsupported and contradicts settled precedent.

Environmental protection is a purpose of the NGA, including Section 3(a)'s regulation of exports, even though it is a subsidiary one. Opening Br. 54 (citing *Sierra Club v. DOE*, 867 F.3d 189, 202–03 (D.C. Cir. 2017) ("*Freeport II*")). Because this Court has affirmed this principle, it does not matter that it was dicta in *NAACP v. Federal Power Commission*, 425 U.S. 662, 670 n.6 (1976), *contra* DOE Br. 25. As DOE admits, the "NGA's standard for authorizing exports is the same as its standard for terminal construction." DOE 28(j) Letter, 1 (Sept. 10, 2026). The latter requires consideration of environmental impacts.

*Healthy Gulf v. FERC*, 107 F.4th 1033, 1043–44, 1047 (D.C. Cir. 2024); *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021). Section 3's standard is also "substantially equivalent" to the NGA's Section 7 standard for interstate pipelines, *W. Va. Pub. Servs. Comm'n v. DOE*, 681 F.2d 847, 855–56 (D.C. Cir. 1982), which requires consideration of "all factors bearing on the public interest, including environmental ones," *Sierra Club v. FERC*, 153 F.4th 1295, 1304 (D.C. Cir. 2025) (citation modified) ("*Cumberland*").

That environmental protection is a "subsidiary" purpose of the NGA does not mean that environmental impacts cannot rebut Section 3's presumption favoring approval, *contra* DOE Br. 26. It takes more than "some evidence" of environmental harm to rebut this presumption. *For a Better Bayou*, 188 F.4th at 529. But if environmental impacts could *never* rebut it, this Court would not have held that NEPA violations undermined Section 3 terminal approvals in *Healthy Gulf*, 107 F.4th at 1043–44, 1047, and *Vecinos*, 6 F.4th at 1331. Moreover, environmental protection is "subsidiary" for the NGA as a whole, not just Section 3, and this Court has repeatedly held that flawed environmental analyses undermined FERC's Section 7 pipeline

approvals. Opening Br. 54 (citing *N.J. Conservation Found. v. FERC*, 111 F.4th 42, 62–63 (D.C. Cir. 2024); *Sierra Club v. FERC*, 867 F.3d 1357, 1373 (D.C. Cir. 2017) ("*Sabal Trail*"), *abrogation on other grounds recognized in Cumberland*, 153 F.4th 1295). Finally, the issue is broader than whether the presumption has been rebutted: even if environmental effects do not cause DOE to reject an export application, they may lead DOE to impose conditions, as it has in other orders. *See Alaska LNG Project*, Docket No. 14-96-LNG, Order No. 3643-C, at 50–51 (Apr. 13, 2023);[2] DOE Br. 27 n.5.

DOE's position that it can ignore environmental impacts therefore must be rejected because it conflicts with the "best reading" of the NGA. *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1238 (D.C. Cir. 2026); Opening Br. 54–57. Whether DOE explained its departure from its prior position is irrelevant, *contra* DOE Br. 28; Int. Br. 29–30.

As Petitioners' Opening Brief explained, where exports will cause changes in gas production and use—and especially where DOE's supply and price analyses rely upon those changes—Section 3 requires DOE to

---

[2] https://www.energy.gov/sites/default/files/2023-04/ord3643-C.pdf.

consider associated foreseeable environmental effects in its public interest analysis, independent of what NEPA requires. Opening Br. 55–57. DOE responds that Section 3(a) does not require considering *these* environmental impacts because it does not require considering *any* environmental impacts at all. DOE Br. 23–27. This Court has rejected this premise.

### B. Because DOE Relied on Upstream and Downstream Activities to Justify Section 3 Authorization, NEPA Required DOE to Consider Foreseeable Environmental Impacts of Those Activities.

NEPA's lodestar is the "usefulness of . . . information to the decisionmaking process." *Seven County*, 605 U.S. at 183 (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004)). The scope of issues "relevant to the agency's decisionmaking process," *id.* at 187, therefore "depends in part on the nature of the agency's statutory authority," *id.* at 200 n.3 (Sotomayor, J., concurring). Because DOE's analysis of supply and price impacts relies on the prediction that exports will spur gas production and DOE's claim of global strategic benefit similarly rests on downstream gas use, those activities and their environmental effects are relevant and within the scope of DOE's NEPA obligations.

Section 3(a) differs drastically from the substantive statute at issue in *Seven County*, as do the rationales given by the agencies to support their decisions. Although both Section 3 and the statute in *Seven County* require evaluating the public interest, Int. Br. 26, they differ in what that evaluation can and must consider. Under the *Seven County* statute, effects from production or use of transported commodities were not pertinent to the Surface Transportation Board's inquiry, 605 U.S. at 201 (Sotomayor, J., concurring) (citing 49 U.S.C. §§ 10101(1)–(15)), and the Board had no authority to control which commodities would be transported, *id.* at 191 n.6 (majority opinion). The Board therefore concluded it could not consider any upstream or downstream effects. *Id.* at 201–02 (Sotomayor, J., concurring). That the *applicant* identified expanding oil drilling and refining as the railroad's purpose, Int. Br. 25, did not make those issues relevant to the *agency's* decisionmaking.

In attempting to analogize the *Seven County* statute to the NGA, DOE Br. 31–35, Respondents ignore the NGA's requirement to consider impacts on gas supply and the Authorization Order's reliance on exports' upstream effects. DOE went beyond finding that increased gas

production "may" occur, *Seven County*, 605 U.S. at 187, or "might somehow or someday follow," *id.* at 190. DOE expended considerable effort confirming that gas markets *will* respond to exports by increasing production. Opening Br. 14–16. Nothing suggests that DOE would have found exports' impacts on supply and prices consistent with the public interest if DOE did not anticipate increased production. *See* DOE Br. 28. Increased gas production is therefore "relevant" to DOE's decisionmaking.

These facts establish that DOE's export authorization is more than a "but for" cause of increased gas production, *Seven County*, 605 U.S. at 189–190, and that there is a "reasonably close causal relationship" between the two. *Pub. Citizen*, 541 U.S. at 767. Because DOE "intends" production to increase, DOE's authorization is a proximate cause of that increase, despite third parties' role in the causal chain linking the two. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419–20 (2011). DOE is therefore "responsible for" this increase. *See Seven Cnty.*, 605 U.S. at 189.

Respondents similarly ignore DOE's reliance on the national security benefits of downstream use of gas. Authorization Order at 51–

54 [JA244–247]. That reliance contrasts with the Surface Transportation Board's inability to consider downstream use of commodities transported by rail. *Seven Cnty.*, 605 U.S. at 201–02 (Sotomayor, J., concurring).

The fact that upstream drilling and downstream use could be characterized as "separate projects" does not make them irrelevant to DOE's decisionmaking here, *contra* DOE Br. 30–31, because the factors *Seven County* found pertinent are not necessarily controlling in a very different statutory context. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023) ("[O]pinions dispose of discrete cases and controversies and . . . must be read with a careful eye to context.") (citation modified). *Seven County* held that the fact that oil drilling and refining were "separate projects" over which the Board "possesse[d] no regulatory authority" helped demonstrate that it was not "responsible for" those activities and they were not "relevant" to its decisionmaking. 605 U.S. at 187–191. Here, DOE has explicitly modeled and relied upon gas production notwithstanding that this production is geographically distant and outside its regulatory authority.

Petitioners' narrow argument here is not an attempt to "resurrect" *Sabal Trail*, *contra* DOE Br. 33. *Sabal Trail* held that NEPA required FERC to analyze all impacts related to activities the NGA *permitted* FERC to consider, regardless of whether those activities actually played a role in FERC's decisionmaking. 867 F.3d at 1373 (*abrogation recognized in Cumberland*, 153 F.4th 1295). Here, Petitioners argue that DOE must, at minimum, address the foreseeable environmental effects of upstream activities DOE *actually* considered and relied upon in the Authorization Order. That is, DOE's reliance on upstream gas drilling means that such drilling's effects are within the manageable line of effects that DOE has determined to be relevant. Opening Br. 63–64. DOE, at 33–34, does not dispute that it could not define the scope of inquiry broadly when considering benefits but narrowly when considering harms (environmental or otherwise): DOE instead mistakenly claims that it could ignore environmental effects entirely.

Finally, DOE did not and could not conclude that considering upstream greenhouse gas impacts would be so burdensome as to be unmanageable. From 2014 through 2024, DOE managed to consider lifecycle greenhouse gas emissions while approving nearly 40 non-FTA

export applications amounting to 15.9 trillion cubic feet per year of capacity. Authorization Order at 59–63 [JA252–256]; Opening Br. 18–21. DOE updated its greenhouse gas analyses shortly before issuing the Exclusion Rule and again before issuing the Authorization Order. DOE could not reasonably conclude that it would be unmanageable to consider reports DOE had already written.

### C. DOE's Conclusion That Upstream and Downstream Greenhouse Gas Emissions Were Unforeseeable Was Arbitrary.

The Exclusion Rule determined that DOE did not need to consider upstream and downstream effects because they were unforeseeable. The conclusion that upstream greenhouse gas emissions were unforeseeable was arbitrary because DOE's own studies had modeled and foreseen these emissions, and neither the Exclusion Rule nor the Authorization Order justified disregarding these predictions. The fact that DOE had not yet estimated downstream emissions when it promulgated the Exclusion Rule did not justify the Rule's conclusion that they would remain unforeseeable. DOE in fact estimated downstream emissions in the 2024 Study, and the Authorization Order's dismissal of that estimate was arbitrary.

**1. DOE Misstates the Exclusion Rule's Rationale.**

DOE erroneously states that the Exclusion Rule determined that upstream and downstream effects could be omitted "because they lack a sufficient causal connection," and that "unforeseeability was not the basis for the Exclusion Rule." DOE Br. 40. This dispute may be immaterial, because the causal connection argument is also wrong, for reasons stated in the Opening Brief, 53–65, and *supra*. But DOE mischaracterizes the Exclusion Rule. Every time the Rule specifically referred to "indirect effects pertaining to increased gas production," it stated that these effects "were not reasonably foreseeable." Exclusion Rule at 78200, 78201 [JA004, JA005]. So too for "downstream emissions." *Id.* at 78200 [JA004]. The Exclusion Rule offered arguments other than foreseeability for other issues, such as the mistaken claim that "FERC has exclusive statutory authority" to consider terminal impacts, *id.* at 78199 [JA003], but offered no parallel argument for omitting upstream production or overseas gas use. DOE cites, at 40, pages discussing the rule's basis generally (without specifically referring to upstream or downstream effects), but these pages (which DOE does not quote) merely reiterate DOE's exclusion of some effects

because they are not "reasonably foreseeable." Exclusion Rule at 78197, 78199 [JA001, JA003].

### 2. DOE's Own Studies Refute DOE's Conclusion That Upstream Greenhouse Gas Emissions Were Unforeseeable.

At all times pertinent here, DOE's own modeling foresaw the amount of increased greenhouse gas emissions from additional export-induced gas production. The Exclusion Rule and Authorization Order's conclusion that these emissions were nonetheless unforeseeable was arbitrary.[3]

DOE does not criticize those studies' inputs or methods, but merely states that emissions are "too uncertain." DOE Br. 43. Some uncertainty is inherent in every forecast, and DOE cannot "shirk [its] responsibilities" by labelling all forecasting as "crystal ball inquiry." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014) (citation modified). NEPA requires DOE to consider "reasonably foreseeable environmental effects," 42 U.S.C. § 4332(2)(C)(i), meaning

---

[3] Arguments about "local" effects, DOE Br. 42, are irrelevant to Petitioners' claim concerning greenhouse gas emissions. Opening Br. 47–51. As DOE has recognized, the factors that can make local and regional upstream effects unforeseeable do not apply to greenhouse gas emissions. DOE0053 at 2 [JA082].

effects "sufficiently likely to occur that a person of ordinary prudence would take [them] into account." *Freeport II*, 867 F.3d at 198; *accord* 169 Cong. Rec. H2681-04, H2704 (May 31, 2023) (explaining that amendment adding "reasonably foreseeable" to § 4332 was intended to adopt this standard). Both the Exclusion Rule and the Authorization Order arbitrarily concluded that effects DOE had already foreseen fell short of this standard. DOE argues that it need not use its own forecasts because they were "assumption-dependent," citing four sources of uncertainty. DOE Br. 43. None support DOE's claim of unforeseeability:

First, any uncertainty in estimates of the amount of export-induced gas production, DOE Br. 42–43, has not stopped DOE from relying on those estimates in supply and price analyses. *See* Opening Br. 15–16. Where DOE relies on an estimate, DOE cannot argue that a prudent person would not.

Second, DOE's estimates of greenhouse gas emissions per unit of additional gas production, DOE Br. 43, are data-backed and robust. They are based on peer-reviewed and federal research, *e.g.*, DOE0053 at 41 [JA087], and account for variability across regions and drilling

methods, *e.g.*, DOE0046 at 8–14 [JA063–069]. The studies' "assumption[s]," DOE Br. 43, were grounded in extensive research, and DOE has not argued that any were unreasonable, nor has DOE otherwise disagreed with any element of these studies. No record evidence calls into question whether these studies are "[r]easonable forecast[s]." *Del. Riverkeeper Network*, 753 F.3d at 1310.

Third, any uncertainty over how to translate a volume of greenhouse gas emissions into resulting impacts from climate change, DOE Br. 43, is not a justification for refusing to disclose the emissions themselves; this Court has held that agencies can meet their NEPA obligations by disclosing greenhouse gas emission totals. *See, e.g., Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1184 (D.C. Cir. 2023).

Fourth, any uncertainty over whether downstream emissions will decrease does not justify refusing to disclose the foreseeable increase in upstream emissions, even if DOE cannot predict the net global impact, *contra* DOE Br. 43. "The mere possibility that a project's overall emissions calculation will be favorable because of an offset elsewhere does not excuse" an agency "from making emissions estimates in the

first place." *Food & Water Watch v. FERC*, 28 F.4th 277, 289 (D.C. Cir. 2022) (citation modified).

DOE's studies of how gas production will increase in response to exports, and of resulting greenhouse gas emissions, were developed by technical experts, scrutinized through public comment, and refined through years of iteration. DOE's conclusion that effects foreseen by these studies were unforeseeable was outside the "zone of reasonableness" and arbitrary. *Seven Cnty.*, 605 U.S. at 183.

#### 3. The Exclusion Rule's Conclusion That Downstream Emissions Would Never Be Foreseeable Was Arbitrary at the Time and Did Not Justify Ignoring Future Analysis.

It was also arbitrary, for different reasons, for both the Exclusion Rule and Authorization Order to conclude that downstream greenhouse gas emissions were unforeseeable.

When the Exclusion Rule was adopted, DOE had not yet modeled how global gas markets would respond to U.S. LNG exports (that came in the 2024 Study, *see* Opening Br. 18). This Court affirmed DOE's determination, in an individual proceeding pre-dating the 2024 Study, that downstream greenhouse gas effects were not foreseeable. *Sierra Club v. DOE*, 134 F.4th 568, 574–75 (D.C. Cir. 2025). But the fact that

downstream emissions could not be foreseen with the information and tools available in an individual proceeding did not support the Exclusion Rule's conclusion that these impacts were categorically unforeseeable, *contra* DOE Br. 43–45. Because new facts can make what was unforeseeable foreseeable, unforeseeability was and is not a valid basis for a categorical exclusion. Opening Br. 51–53.

Even if the Exclusion Rule's treatment of downstream effects was proper at the time, it was arbitrary for the Authorization Order to conclude that the Exclusion Rule's determination of unforeseeability permitted DOE to ignore DOE's own subsequent conclusion (in the 2024 Study) that downstream greenhouse gas emissions were foreseeable. *Cf. Meredith Corp. v. FCC*, 809 F.2d 863, 873 (D.C. Cir. 1987), *contra* DOE Br. 45. DOE claims that the 2024 Study's downstream analysis was uncertain, DOE Br. 44, but DOE does not disagree with any assumptions, data, or methods used in the 2024 Study.

## IV. DOE'S CONCLUSION THAT SHIP TRAFFIC WILL HAVE INSIGNIFICANT IMPACTS WAS ARBITRARY.

Where DOE concluded that LNG vessel traffic impacts were insignificant because they had "the potential to contribute only a very

small amount to total shipping. . . . [and] LNG shipments comprise[d] less than one percent of vessel calls from U.S. ports annually," Exclusion Rule at 78202 [JA006], it is not "quibbl[ing]," DOE Br. 17, to point out that DOE measured the wrong thing. DOE arbitrarily used past ship traffic as a proxy for future shipping levels despite knowing that export volumes were rapidly increasing; ignored that LNG exports were (and remain) overwhelmingly concentrated in the Gulf; and ignored mechanisms by which ship traffic harms endangered whales.

First, the Exclusion Rule's reliance on the fact that 2019 LNG export traffic entailed only 563 shipments, Exclusion Rule at 78202 [JA006], was arbitrary. In that year, exports amounted to only 1.8 trillion cubic feet of gas as LNG, CP20211 at 2 [JA474], and DOE had already authorized and predicted drastically higher levels of export. As of February 2020, DOE had authorized 16.4 trillion cubic feet per year of non-FTA exports. Opening Br. 67 (citing DOE0063 at 44 [JA119]). DOE argues that it does not know whether authorized exports will occur and need not "expend further resources on an attempt to model future ship traffic." DOE Br. 38 (quotation omitted). But as with lifecycle impacts, the problem is DOE's refusal to consider modeling it

had already done. In 2020, prior to publication of the Exclusion Rule, DOE's orders relied on its Annual Energy Outlook's prediction that exports would reach 5.8 trillion cubic feet per year. *E.g.*, DOE0063 at 34–35 [JA114–115]. Other DOE studies predicted even higher levels. *Id.* at 10 [JA113] (summarizing a 2018 study, CP20117 [JA447–462], as predicting that the "more likely range of LNG exports in the year 2040" was 3.2 to 11.2 trillion cubic feet per year). DOE's own estimates are "substantial" evidence that a "significant" increase in exports is likely. DOE Br. 38. While DOE's choice between studies may be entitled to deference, DOE's refusal to apply *any* of its own studies falls outside the zone of reasonableness. *Seven Cnty.*, 605 U.S. at 182–83.

The Authorization Order compounded the Exclusion Rule's error: post-2020, both DOE's additional export authorizations and its analyses of global LNG demand confirmed that pre-2020 ship traffic did not represent future impacts. The Authorization Order brought total lower-48-state non-FTA export authorizations to 19.3 trillion cubic feet per year, and cited the 2024 Study's "project[ion]" that "LNG exports will increase to 20.5" trillion cubic feet per year. Authorization Order at 53, 59 [JA246, 252]. Regardless of whether the 2024 Study was "intended to

be a forecast of actual future exports," DOE Br. 38 (citing CP20253 at S-v [JA527]), the Authorization Order treated it as one. The Authorization Order also cited other studies that *were* clearly intended as forecasts, which similarly predicted vastly increased export levels. *See* Authorization Order at 54 [JA247] (citing CP20240 (Energy Information Administration's International Energy Outlook 2023)); CP20240 at 43 [JA500] (predicting 10 to 18 trillion cubic feet per year of U.S. LNG exports).

Second, DOE arbitrarily diluted the impact of LNG ship traffic by comparing it to overall U.S. ship traffic, despite the overwhelming concentration of U.S. LNG exports in the Gulf.[4] Petitioners' evidence that this concentration is "significant," DOE Br. 38, is that the Gulf hosts terminals amounting to 93% of authorized LNG export volumes, CP20287 at 2 [JA576], but is home to only 50% of nationwide ship traffic. *See* Endangered Status of the Gulf of Mexico Bryde's Whale, 84 Fed. Reg. 15446, 15483 (Apr. 15, 2019). Thus, at the time the Exclusion

---

[4] While Petitioners did not make an extraordinary circumstances argument regarding CP2's vessel traffic, *see* Int. Br. 36, they raised the concentration of LNG vessels in the Gulf and resulting impact on Rice's whale as part of their challenge to the Exclusion Rule.

Rule was adopted, existing LNG exports only accounted for 1% of nationwide ship traffic, but DOE had authorized future exports that would increase total LNG traffic in the Gulf to something like 20%.

Finally, DOE's arguments that even a large volume of LNG traffic will have insignificant effects are arbitrary and unsupported. If other ship traffic increases in "proportion" with LNG traffic, DOE Br. 38, that exacerbates—not mitigates—harms to whales and the marine environment from increased LNG traffic. Opening Br. 68. Even a "very small portion" of a large problem can itself constitute a large problem. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1032 (5th Cir. 2019). DOE separately asserts that ship traffic does not actually impact whales, but cites documents discussing only vessel strikes and ignoring ship noise, DOE Br. 39, a major source of harm identified in both peer-reviewed record evidence, Opening Br. 68 (citing DOE0011 at 4–8 [JA036–040]), and the National Marine Fisheries Service's 2019 listing decision, 84 Fed. Reg. at 15463–66, 15483.[5]

---

[5] Until 2021, the Rice's whale was known as the Gulf of Mexico Bryde's whale. CP20170 at 47022 [JA465].

## V. REMEDY

This Court should apply the *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), test to the Authorization Order and Exclusion Rule separately, weighing each action's deficiencies against the disruptive consequences of its vacatur independently. *See Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 382–83 (D.C. Cir. 2026) (separately weighing *Allied-Signal* factors, including "deficiencies of *each* action," for four agency actions (emphasis added)); *see also Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50–53 (9th Cir. 2025) (same). Both actions suffer from serious deficiencies. DOE represents that, if the Exclusion Rule were remanded, it would approve export applications without relying on the Rule, DOE Br. 59, effectively conceding that vacating the Exclusion Rule would not disrupt future export application approvals. Moreover, DOE's vacatur argument, DOE Br. 56–57, relies on language in *Seven County* that is specific to NEPA claims regarding project approvals, 605 U.S. at 184–85 (discussing "the agency's final decision *concerning [a] project*" and "the agency's ultimate approval *of a project*") (emphases added), but is irrelevant to the challenge to the Exclusion Rule itself.

## CONCLUSION

For the reasons stated above, the petition should be granted, and the Court should vacate the Exclusion Rule, Authorization Order, and Rehearing Order.

DATED: Oct. 13, 2026

Respectfully submitted,

*/s/ Nathan Matthews*
Nathan Matthews
Earthjustice
180 Steuart Street, #194330
San Francisco, CA 94105
415.217.2183
nmatthews@earthjustice.org

Ann Jaworski
Earthjustice
311 S. Wacker Drive, Suite 1400
Chicago, IL 60606
773.245.0837
ajaworski@earthjustice.org

Alexandra M. Smith
Earthjustice
1250 I Street NW, 4th Floor
Washington, DC 20005
202.798.5384
lsmith@earthjustice.org

*Counsel for Petitioner Sierra Club*

*/s/ Addie Rolnick*
Adeline S. Rolnick

Gillian R. Giannetti
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
202.513.6240
arolnick@nrdc.org
ggiannetti@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), this document contains 6,480 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word for Windows Office 365 in 14 point Century Schoolbook.

*/s/ Nathan Matthews*
Nathan Matthews
Earthjustice
180 Steuart Street, #194330
San Francisco, CA 94105
415.217.2183
nmatthews@earthjustice.org

*Counsel for Petitioner Sierra Club*

# SUPPLEMENT TO STATUTORY ADDENDUM

## Table of Contents

49 U.S.C. § 10101

49 U.S.C.A. § 10101

# § 10101. Rail transportation policy

Currentness

In regulating the railroad industry, it is the policy of the United States Government--

**(1)** to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

**(2)** to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;

**(3)** to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Board;

**(4)** to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;

**(5)** to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;

**(6)** to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;

**(7)** to reduce regulatory barriers to entry into and exit from the industry;

**(8)** to operate transportation facilities and equipment without detriment to the public health and safety;

**(9)** to encourage honest and efficient management of railroads;

**(10)** to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(11)** to encourage fair wages and safe and suitable working conditions in the railroad industry;

**(12)** to prohibit predatory pricing and practices, to avoid undue concentrations of market power, and to prohibit unlawful discrimination;

**(13)** to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information;

**(14)** to encourage and promote energy conservation; and

**(15)** to provide for the expeditious handling and resolution of all proceedings required or permitted to be brought under this part.

**CREDIT(S)**

(Added Pub.L. 104-88, Title I, § 102(a), Dec. 29, 1995, 109 Stat. 805.)

49 U.S.C.A. § 10101, 49 USCA § 10101
Current through P.L. 119-103. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2026, I caused the foregoing document to be served via the Court's CM/ECF system to all counsel registered as CM/ECF users.

*/s/ Nathan Matthews*
Nathan Matthews
Earthjustice
180 Steuart Street, #194330
San Francisco, CA 94105
415.217.2183
nmatthews@earthjustice.org

*Counsel for Petitioner Sierra Club*